# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

FRANK FINAZZO, derivatively on behalf of HENRY SCHEIN, INC.,

Plaintiff,

vs.

STANLEY M. BERGMAN, STEVEN PALADINO, TIMOTHY J. SULLIVAN, BARRY J. ALPERIN, LAWRENCE S. BACOW, GERALD A. BENJAMIN, JAMES P. BRESLAWSKI, PAUL BRONS, SHIRA GOODMAN, JOSEPH L. HERRING, DONALD J. KABAT, KURT KUEHN, PHILIP A. LASKAWY, ANNE H. MARGULIES, KARYN MASHIMA, NORMAN S. MATTHEWS, MARK E. MLOTEK, CAROL RAPHAEL, E. DIANNE REKOW, BRADLEY T. SHEARES, and LOUIS W. SULLIVAN,

Defendants,

and

HENRY SCHEIN, INC.,

Nominal Defendant.

Case No.:

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Frank Finazzo ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendant Henry Schein, Inc. ("Henry Schein" or the "Company"), files this Verified Shareholder Derivative Complaint against Stanley J. Bergman, Steven Paladino, Timothy J. Sullivan, Barry J. Alperin, Lawrence S. Bacow, Gerald A. Benjamin, James P. Breslawski, Paul Brons, Shira Goodman, Joseph L. Herring, Donald J. Kabat, Kurt Kuehn, Philip A. Laskawy, Anne H. Margulies, Karyn Mashima, Norman S. Matthews, Mark E. Mlotek, Carol Raphael, E. Dianne

Rekow, Bradley T. Sheares, and Louis W. Sullivan (collectively, the "Individual Defendants," and together with Henry Schein, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Henry Schein, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Section 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for his complaint against the Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Henry Schein, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Henry Schein's directors and officers from March 7, 2013 through February 12, 2018 (the "First Relevant Period"), and from February 8, 2019 through the present (the "Second Relevant Period").

2.      Henry Schein is purportedly the largest distributor of healthcare products in the world. The Company serves over 1 million customers, which include dental practitioners, institutional healthcare facilities and clinics, laboratories, and other healthcare providers.

3.       The Company's business consists of the following three primary segments: (i) Henry Schein Medical, which distributes branded and generic pharmaceuticals, laboratory equipment, and other medical products and services; (ii) Henry Schein Animal Health, a now-

discontinued segment that distributed veterinary products and services; and (iii) Henry Schein Dental, which distributes dental implants, anesthetics, X-ray supplies and equipment, and other dental products and services.

4.     The Company's dental segment accounted for approximately 37.5% of dental products and services sold in the United States during 2017, and made up nearly 50% of the Company's net sales for the fiscal year ended December 31, 2017.

5.     Henry Schein, along with competitors Benco Dental Supply Co. ("Benco") and Patterson Companies, Inc. ("Patterson"), collectively control about 85% of the sale of all dental products and services made through distributors in the United States.

6.     In recent years, independent dentists have adopted a purchasing strategy used in the medical industry, forming group purchasing organizations ("GPOs" or "buying groups") to combine purchasing power in order to obtain lower prices from distributors.

7.     Prior to, and throughout the First Relevant Period, Benco, Patterson, and Henry Schein engaged in a conspiracy in restraint of trade, whereby the companies agreed to: (i) refuse to offer discounted prices or otherwise negotiate with GPOs; (ii) fix margins on dental supplies and equipment; (iii) refrain from poaching one another's customers or sales representatives; and (iv) block the entry and expansion of rival distributors, all of which had the effect of inflating the prices of dental products and driving down competition in the dental products market, thus benefiting large, established distributors such as Benco, Patterson, and Henry Schein (the "Antitrust Conspiracy"). This agreement was made and enforced by senior executives at these companies.

8.     During the First Relevant Period, the Individual Defendants caused Henry Schein to engage in the Antitrust Conspiracy. Even if Henry Schein did not engage directly in the Antitrust

Conspiracy, the Individual Defendants were aware of it and of how it improperly benefitted Henry Schein.  The Individual Defendants, by virtue of their positions as senior officers and/or directors of the Company, were well aware of the lack of competition in the market for dental products that resulted from the Antitrust Conspiracy. Despite this, throughout the First Relevant Period, the Individual Defendants consistently represented to the investing public that the market for dental products was highly competitive, and ascribed the high prices of the Company's dental products to cost containment in the market, as well as the Company's value-added services.

9.      On February 12, 2018, the Federal Trade Commission filed an administrative complaint against Henry Schein, Benco and Patterson. The complaint alleged that starting from at least February 2013, the named entities had engaged in a conspiracy to fix the prices of dental supply products and refused to sell to GPOs, in violation of federal antitrust law.

10.     On this news, the price of Henry Schein shares plummeted by over 6.6%, or $4.79, from closing at $72.18 per share on February 12, 2018, to close at $67.39 per share on February 13, 2018, representing a loss of roughly $785 million in Henry Schein's market capitalization.

11.     Months later, during April 2018, Henry Schein began the process of merging Henry Schein Animal Health with Vets First Choice ("VFC"), another animal health company. After the businesses merged, Henry Schein divested and separated itself of the resultant entity, which was named Covetrus, Inc. ("Covetrus"). During this period, Henry Schein incorporated HS Spinco, the entity that would become Covetrus, in Delaware.

12.     On December 26, 2018, the Individual Defendants caused Henry Schein to cause HS Spinco to file a Registration Statement on Form S-4 with the SEC. Among other things, the Registration Statement stated that Covetrus's "key strengths" included "inventory management

and supply chain services and technology that help improve practice efficiency and economics," and that Covetrus was "well suited" to compete in the animal healthcare market.

13.     Additionally, Henry Schein entered into certain Transition Services Agreements ("TSAs") with Covetrus, under which Covetrus would pay Henry Schein to handle some of Covetrus's administrative services until Covetrus was able to establish its own organizational infrastructure such that it could effectively handle those services.

14.     In reality, however, Covetrus was significantly less well-prepared to do business in the animal healthcare market than Henry Schein's representations made it out to be. Ultimately, Covetrus would require millions of dollars in additional investments to shore up its supply chain and inventory management services, and Covetrus's expenses associated with Covetrus's TSAs with Henry Schein would be greater than Covetrus or Henry Schein had represented.

15.     On February 8, 2019, Covetrus common stock began trading on NASDAQ, marking the beginning of the Second Relevant Period. Shortly thereafter, at industry conferences held during March 2019, Defendant Paladino made statements touting Covetrus's financial prospects and the role that the TSAs would play in getting Covetrus up and running as a new company.

16.     The truth was revealed as to Covetrus's true financial condition and prospects on August 13, 2019, when Covetrus issued a press release disclosing disappointing financial results and reduced earnings before interest, taxes, depreciation, and amortization ("EBITDA") guidance. Covetrus's share price declined considerably as a result, from $23.19 per share at the close of trading on August 12, 2019, to $13.89 at the close of trading on August 13, 2019.

17.     During the First Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls, as well as causing

Henry Schein to engage in the Antitrust Conspiracy, and at least to knowingly cause it to benefit from the Antitrust Conspiracy.

18.     During the First Relevant Period, the Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects, and legal compliance. Specifically, during the First Relevant Period the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) as a result of the Antitrust Conspiracy, the dental products market was not competitive, but was in fact pervaded by price-fixing and other anticompetitive misconduct; (2) as an additional result of the Antitrust Conspiracy, the Company overstated the impact of cost containment and pricing strategies on its business; (3) as a further result of the Antitrust Conspiracy, the Company overstated the value of its products and services; (4) the Company participated in the Antitrust Conspiracy; and (5) the Company failed to maintain internal controls.

19.     As a result of the foregoing, the Individual Defendants' and Company's public statements were materially false and misleading during the First Relevant Period. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

20.     During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing Henry Schein to make a series of materially false and misleading statements regarding Covetrus's business, operations, and prospects. Specifically, during the Second Relevant Period, the Individual Defendants willfully or recklessly

made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia,* that: (1) Covetrus would require millions of dollars in infrastructure investments relating to Covetrus's supply chain and inventory management services; (2) Covetrus was not fully apprised as to the additional infrastructure investments that Covetrus would require; (3) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (4) a competitive market, as well as the loss of a significant North American customer "weighed heavily" on Covetrus's growth prospects.

21.     As a result of the foregoing, the Individual Defendants' and Henry Schein's public statements were materially false and misleading during the Second Relevant Period. The Individual Defendants failed to correct and caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

22.     Furthermore, during the First Relevant Period, when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, the Individual Defendants caused the Company to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentations, while 12 of them engaged in lucrative insider sales, netting proceeds of over $130.8 million. Approximately 850 million shares of the Company's common stock were repurchased during the First Relevant Period for over $1.67 billion. As the Company's stock was actually only worth $67.39 per share during that time, the price at which it was trading on February 13, 2018, the Company overpaid by over $776 million in total.

23.     During the Second Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

24.     The Individual Defendants' breaches of fiduciary duty and other misconduct have subjected Henry Schein to numerous lawsuits and regulatory proceedings including: (i) an administrative complaint brought by the Federal Trade Commission (the "FTC") for violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, in action captioned *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. and Patterson Companies, Inc.*, Docket. No. 9379 (FTC), filed February 12, 2018 (the "FTC Action"); (ii) an antitrust action alleging Sherman Act and state antitrust law violations filed by SourceOne Dental, Inc. ("SourceOne") in the United States District Court for the Eastern District of New York, which Henry Schein agreed to settle on June 27, 2017 for $5.3 million[1] (the "SourceOne Action"); (iii) an antitrust action alleging Sherman Act, state antitrust law, and state common law violations filed by IQ Dental Supply, Inc. ("IQ Dental") in the United States District Court for the Eastern District of New York, which was dismissed on antitrust standing grounds[2] (the "IQ Dental Action"); (iv) a class action complaint brought by a class of purchasers of dental products for violations of the Sherman Act filed in the United States District Court for the Eastern District of New York, which Henry Schein agreed to settle on August 30, 2018 for $38.5 million[3] (the "Antitrust Action"); (v) a complaint filed in the United States District Court for the Eastern District of Texas by Archer & White Sales, Inc. ("AW") against Henry Schein and certain medical equipment manufacturers for conspiring to prevent manufacturers from doing business with AW[4] (the "AW Action"); (vi) a suit instituted by

---

[1] *SourceOne Dental, Inc. v. Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. 2:15-cv-05440-BMC-GRB (E.D.N.Y.), filed September 9, 2015.

[2] *IQ Dental Supply, Inc. v. Henry Schein, Inc., Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. 2:17-cv-04834-BMC-GRB (E.D.N.Y.), filed August 17, 2017. This action was dismissed with prejudice for lack of antitrust standing on IQ Dental Supply's antitrust claims, and for failure to state a claim on the remaining state claims.

[3] *In re Dental Supplies Antitrust Litigation*, Docket No. 1:16-cv-00696-BMC-GRB, (E.D.N.Y.), filed February 26, 2016.

[4] *Archer and White Sales, Inc. v. Henry Schein, Inc. et al.*, No. 2:12-cv-00572-JRG (E.D. Tex.), filed August 31, 2012.

the State of Texas which was ultimately settled for injunctive relief[5] (the "Texas AG Action");
(vii) a federal securities fraud class action lawsuit brought on behalf of Henry Schein shareholders
pending in the United States District Court for the Eastern District of New York (the "2018
Securities Class Action") against Henry Schein, its Chief Executive Officer ("CEO"), and its Chief
Financial Officer ("CFO"), and the President of Henry Schein's North American Dental Group to;
and (viii) a subsequent securities class action lawsuit brought on behalf of Covetrus shareholders,
also pending in the United States District Court for the Eastern District of New York (the "2019
Securities Class Action," and together with the 2018 Securities Class Action, the "Securities Class
Actions"). The Individual Defendants' breaches of fiduciary duty and other misconduct have also
resulted in the need for Henry Schein to undertake internal investigations; losses due to the
Company's overpayment of approximately $776 million for the repurchases of its own stock and
due to Individual Defendants having been improperly over-compensated by the Company, and will
cost the Company going forward many millions of dollars.

25.     In the Antitrust Action, District Judge Brian M. Cogan denied defendants Henry
Schein, Patterson, Benco, and Burkhart Dental Supply Company's motions to dismiss on
September 28, 2016, finding, "Plaintiffs have sufficiently alleged that defendants orchestrated a
single interconnected nationwide conspiracy not to compete on price with the common goal of
driving up margins and preventing competitive upstarts from gaining a larger share of the market."
Antitrust Order at 7, *In re Dental Supplies Antitrust Litigation*, Docket No. 1:16-cv-00696-BMC-
GRB, (E.D.N.Y. Sep. 28, 2016) ("Antitrust Order").

26.     In the SourceOne Action, District Judge Brian M. Cogan denied defendants
Patterson and Benco's motion for summary judgment on April 12, 2018 with respect to all claims

---

[5] *State of Texas v. Henry Schein, Inc*., No. D-1-GN-17-003749 (Travis Cnty., Tx.), filed August 3, 2017.

other than SourceOne's state law aiding-and-abetting claims. SourceOne Order at 1-2, *SourceOne Dental, Inc. v. Patterson Companies, Inc. and Benco Dental Supply Company*, Docket No. 2:15-cv-05440, (E.D.N.Y. Apr. 12, 2018) ("SourceOne Order").

27.     In the 2018 Securities Class Action, District Judge Margo K. Brodie denied defendants Henry Schein, Stanley M. Bergman, Steven Paladino, and Timothy J. Sullivan's motion to dismiss on September 27, 2019, finding that defendants' statements about the competitiveness of the dental products market, the Company's cost containment and pricing, and the Company's value-added services constituted material misstatements or omissions. 2018 Securities Class Action Order at 19, 29-31, *In re Henry Schein, Inc. Securities Litigation*, Docket No. 1:18-cv-01428-MKB-VMS, (E.D.N.Y. Sep. 27, 2019) ("2018 Securities Class Action Order").

28.     In the FTC Action, Chief Administrative Law Judge D. Michael Chappell issued an initial decision on October 16, 2019, holding that Patterson and Benco were liable for a *per se* violation of Section 5 of the Federal Trade Commission Act. Patterson and Benco declined to appeal that decision, thus rendering the initial decision it a final decision. In determining the scope of Section 5 of the Federal Trade Commission Act, Judge D. Michael Chappell stated, "[t]he analysis under § 5 of the FTC Act is the same . . . as it would be under § 1 of the Sherman Act." FTC Decision at 10, *In the Matter of Benco Dental Supply Co., Henry Schein, Inc. and Patterson Companies, Inc.*, Docket. No. 9379 (FTC Oct. 16, 2019) ("FTC Decision"), (citing *Polygram Holding, Inc. v. FTC*, 416 F.3d 29, 32 (D.C. Cir. 2005).

29.     Judge D. Michael Chappell dismissed the FTC's Action with respect to Henry Schein, holding that the FTC had not met the "burden of proving that an agreement involving Schein is more likely than not." FTC Decision at 95. The decision stated the following, as to Henry Schein:

> Having fully reviewed and considered the totality of the evidence, the arguments of the parties, and the applicable law, and for all the reasons set forth herein, the evidence, viewed as a whole, fails to persuasively demonstrate that Schein conspired with Benco, or with Benco and Patterson, to refuse to discount to or otherwise negotiate with buying groups, as alleged in the Complaint. Although there are some statements in some documents that could be interpreted as consistent with Complaint Counsel's conspiracy theory, and Benco's apparent willingness to reach out to Schein raises concerns, the evidence as a whole does not hold up under reasonable scrutiny.

*Id*. Importantly, Judge Chappell's holding does not cover liability for antitrust related misconduct for Henry Schein under the Clayton Act (15 U.S.C. §§ 12-27).

30. In *Gottesman v. General Motors Corp.,* the U.S. District Court for the Southern District of New York stated the following, with respect to violations of the Clayton Act:

> It seems too obvious to require discussion that facts on which a finding of a violation of the Clayton Act is based are insufficient to support a finding of a violation of the Sherman Act, since the Clayton Act was intended to catch potential Sherman Act violations in their incipiency.

*Gottesman v. General Motors Corporation,* 221 F.Supp. 488, 492 (S.D.N.Y.1963).

31. In *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* the U.S. Court of Appeals for the Ninth Circuit stated that "a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing cases." *Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc.,* 676 F.2d 1291, 1304, fn. 9 (9th Cir.1982).

32. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

33. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, 15 of whom are the Company's current directors, of the substantial likelihood of the directors' liability in this derivative action and of their not being disinterested and/or independent directors, a majority of the Henry Schein Board of Directors (the "Board") cannot consider a demand to

commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

34.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

35.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

36.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

37.     Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

38.     Plaintiff is a current shareholder of Henry Schein. Plaintiff has continuously held Henry Schein common stock since November 24, 1998.

**Nominal Defendant Henry Schein**

39.     Henry Schein is a Delaware corporation with its principal executive offices located at 135 Duryea Road, Melville, New York 11747. Henry Schein's shares trade on the NASDAQ Stock Exchange ("NASDAQ") under the ticker symbol "HSIC."

**Defendant Bergman**

40.     Defendant Stanley M. Bergman ("Bergman") has served as the Company's Chairman and CEO since 1989, and as a director since 1982. According to the Company's Schedule 14A filed with the SEC on April 9, 2019 (the "2019 Proxy Statement"), as of March 25, 2019, Defendant Bergman beneficially owned 912,786 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Bergman owned approximately $53.7 million worth of Henry Schein stock.

41.     For the fiscal year ended December 31, 2018, Defendant Bergman received $6,481,739 in compensation from the Company. This included $1,417,577 in salary, $2,975,000 in stock awards, $1,776,739 in non-equity incentive plan compensation, and $312,423 in all other compensation.

42.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bergman made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/21/2013 | 10,000 | $90.19 | $901,900 |
| 12/12/2013 | 48,600 | $112.23 | $5,454,621 |
| 12/13/2013 | 29,400 | $111.77 | $3,285,891 |
| 12/8/2014 | 23,485 | $136.34 | $3,201,944 |
| 12/9/2014 | 46,115 | $135.21 | $6,234,978 |
| 12/9/2015 | 35,800 | $155.78 | $5,576,924 |


| 12/10/2015 | 26,000 | $155.17 | $4,034,419 |
| 11/7/2016 | 38,886 | $156.29 | $6,077,687 |
| 11/11/2016 | 5,414 | $156.12 | $2,406,510 |

43.     Thus, in total, before the fraud was exposed, he sold 263,700 Company shares on inside information, for which he received over $37.1 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2019 Proxy Statement stated the following about Defendant Bergman:

> **STANLEY M. BERGMAN** has been with the Company since 1980, including as Chairman and Chief Executive Officer since 1989 and as a director since 1982. He is also a member of our Executive Management Committee and our Technology Advisory Board. Mr. Bergman held the position of President of the Company from 1989 to 2005. Mr. Bergman held the position of Executive Vice President from 1985 to 1989 and Vice President of Finance and Administration from 1980 to 1985. Mr. Bergman brings to the Company's Board of Directors management and leadership experience. Mr. Bergman is a well-known, highly regarded leader in the global health care industry. He has expansive knowledge of the health care industry and macro-economic global conditions, maintains strategic relationships with chief executives and other senior management in the health care industry throughout the world and brings a unique and valuable perspective to the Board of Directors. During his tenure, Mr. Bergman has led the Company from sales of $600 million in 1995 to $13.2 billion in 2018. Mr. Bergman serves as a board member or advisor for numerous institutions, including New York University College of Dentistry, the University of Pennsylvania School of Dental Medicine, the Columbia University Medical Center, Hebrew University, Tel Aviv University, the University of the Witwatersrand Fund, the World Economic Forum's Health Care Governors and the Business Council for International Understanding. Mr. Bergman is also a member of the boards of numerous charitable organizations and active with philanthropic causes and social responsibility activities. Mr. Bergman is a Certified Public Accountant.

45.     Upon information and belief, Defendant Bergman is a resident of New York.

**Defendant Paladino**

46.     Defendant Steven Paladino ("Paladino") has served as the Company's Executive Vice President and CFO since 2000, and as a director since 1992. Defendant Paladino also serves on the board of directors of Covetrus. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Paladino beneficially owned 119,675 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Paladino owned approximately $7,045,267 worth of Henry Schein stock.

47.     For the fiscal year ended December 31, 2018, Defendant Paladino received $2,651,998 in compensation from the Company. This included $582,096 in salary, a $75,000 bonus, $1,275,000 in stock awards, $644,925 in non-equity incentive plan compensation, and $74,977 in all other compensation.

48.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Paladino made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/7/2013 | 39,000 | $89.44 | $3,488,160 |
| 12/16/2013 | 47,652 | $112.29 | $5,350,986 |
| 2/20/2014 | 28,757 | $117.79 | $3,387,287 |

49.     Thus, in total, before the fraud was exposed, he sold 115,409 Company shares on inside information, for which he received over $12.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     The Company's 2019 Proxy Statement stated the following about Defendant Paladino:

*STEVEN PALADINO* has been with the Company since 1987, in his current position as Executive Vice President and Chief Financial Officer since 2000 and as a director since 1992. He is also a member of our Executive Management Committee. Prior to holding his current position, from 1993 to 2000, Mr. Paladino was Senior Vice President and Chief Financial Officer, from 1990 to 1992, he served as Vice President and Treasurer and, from 1987 to 1990, he served as Corporate Controller. Before joining us, Mr. Paladino was employed as a Certified Public Accountant for seven years, most recently with the international accounting firm of BDO Seidman LLP (now known as BDO USA, LLP). Mr. Paladino brings to the Company's Board of Directors extensive financial, accounting and industry expertise and a strong, credible reputation within the financial industry. Mr. Paladino's responsibilities with the Company include the corporate oversight and strategic direction of business units as well as direct responsibility for corporate financial services. These corporate financial services include financial reporting, financial planning, treasury, investor relations, internal audit and taxation. Mr. Paladino also has responsibility for Henry Schein Financial Services (which provides financial business solutions to our customers) and also works with the Corporate Business Development Group on mergers and acquisition activities. Mr. Paladino's skills in corporate finance and accounting, the depth and breadth of his exposure to complex financial issues and his long-standing relationships with the financial community are valued by the Board of Directors. Mr. Paladino currently serves on the Board of Directors of MSC Industrial Direct Co., Inc. (and is a member of its audit committee and compensation committee).

51.     Upon information and belief, Defendant Paladino is a resident of New York.

**Defendant T. Sullivan**

52.     Defendant Timothy J. Sullivan ("T. Sullivan") has served as the President of Henry Schein's North American Dental Group since at least 2006. Defendant T. Sullivan previously served as the President, CEO, and CFO of Sullivan Dental Products, Inc., until it was acquired by Henry Schein in 1997.

53.     Upon information and belief, Defendant T. Sullivan is a resident of Wisconsin.

**Defendant Alperin**

54.     Defendant Barry J. Alperin ("Alperin") has served as a Company director since 1996. He also serves as the Chairperson of the Company's Compensation Committee, and as a member of the Audit Committee and Nominating and Governance Committee. According to the

2019 Proxy Statement, as of March 25, 2019, Defendant Alperin beneficially owned 50,963 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Alperin owned approximately $3,000,191 worth of Henry Schein stock.

55.     For the fiscal year ended December 31, 2018, Defendant Alperin received $308,400 in compensation from the Company. This included $123,000 in fees earned or paid in cash and $185,400 in stock awards.

56.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Alperin made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/11/2013 | 7,500 | $90.07 | $675,525 |
| 6/18/2013 | 7,500 | $97.74 | $733,050 |
| 3/19/2014 | 7,500 | $119.18 | $893,850 |
| 6/9/2014 | 7,500 | $120.39 | $902,925 |
| 3/5/2015 | 6,637 | $140.64 | $933,427 |
| 3/7/2016 | 1,635 | $167.36 | $273,633 |
| 3/6/2017 | 6,565 | $170.47 | $1,119,168 |
| 12/1/2017 | 5,796 | $70.76 | $410,124 |

57.     Thus, in total, before the fraud was exposed, he sold 50,633 Company shares on inside information, for which he received over $5.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

58.     The Company's 2019 Proxy Statement stated the following about Defendant Alperin:

**BARRY J. ALPERIN** has been a director since 1996. Mr. Alperin, who is retired, served as Vice Chairman of Hasbro, Inc. from 1990 through 1995, as Co-Chief Operating Officer of Hasbro from 1989 through 1990 and as Senior Vice President or Executive Vice President of Hasbro from 1985 through 1989. He was a director of Hasbro from 1985 through 1996. Prior to joining Hasbro, Mr. Alperin practiced law in New York City for 20 years, dealing with corporate, public and private financial transactions, corporate mergers and acquisitions, compensation issues and securities law matters. The Company values Mr. Alperin's financial expertise and his extensive experience in corporate and securities laws and corporate governance matters. Additionally, as the Company continues to grow through strategic acquisitions, the Board of Directors values Mr. Alperin's experience leading Hasbro's mergers and acquisitions and global expansion efforts. Mr. Alperin currently serves as a director of: Fiesta Restaurant Group, Inc. (and is Chairman of its finance committee and a member of its audit committee); Jefferies Financial Group, Inc. (formerly known as Leucadia National Corporation), a diversified financial services company engaged in investment banking, capital markets, asset management and principal investing (and is a member of its audit committee, compensation committee, nominating and corporate governance committee and valuation oversight committee); and Jefferies Group L.L.C., a full service global investment banking firm (and is a member of its audit committee, compensation committee and corporate governance and nominating committee). Mr. Alperin is also a director of Weeks Marine, Inc., a privately held marine construction company. He currently serves as a trustee of The Caramoor Center for Music and the Arts (and a member of its executive committee), President Emeritus and a Life Trustee of The Jewish Museum in New York City and is a past President of the New York Chapter of the American Jewish Committee where he also served as Chair of the audit committee of the national organization.

59.    Upon information and belief, Defendant Alperin is a resident of New York.

**Defendant Bacow**

60.    Defendant Lawrence S. Bacow ("Bacow") served as a Company director from 2014 until he stepped down on May 31, 2018. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Bacow beneficially owned 7,272 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Bacow owned approximately $428,102 worth of Henry Schein stock.

61.     For the fiscal year ended December 31, 2018, Defendant Bacow received $224,427 in compensation from the Company. This included $39,027 in fees earned or paid in cash and $185,400 in stock awards.

62.     The Company's Schedule 14A filed with the SEC on April 10, 2017 (the "2017 Proxy Statement"), stated the following about Defendant Bacow:

> **LAWRENCE S. BACOW, PH.D.** has been a director since 2014. Dr. Bacow is currently Leader-in-Residence at the Center for Public Leadership at Harvard's Kennedy School of Government. Dr. Bacow is also a member of the Harvard Corporation, the fiduciary oversight board of Harvard University, where he chairs the finance committee. From 2001 to 2011, Dr. Bacow was the 12th President of Tufts University, where he oversaw all seven of the University's schools, including its School of Dental Medicine, School of Medicine and the Cummings School of Veterinary Medicine. In addition, he served on the Board of Trustees and as a member of the executive committee of Tufts Medical Center. Following Tufts, Dr. Bacow served as President-in-Residence in the Higher Education Program at Harvard's Graduate School of Education for three years. Earlier in his career, Dr. Bacow spent 24 years on the faculty at the Massachusetts Institute of Technology, where he held the Lee and Geraldine Martin Professorship of Environmental Studies. He also served as the elected Chair of the MIT Faculty and subsequently as Chancellor, one of the Institute's two most senior academic officers. The Company values Dr. Bacow's extensive experience as a leader in academia and public service. He brings an important perspective to our Board of Directors, having overseen the training of every customer group we serve, namely dentists, physicians and veterinarians. Dr. Bacow also brings to the Company impeccable credentials and broad-based management expertise. As a lawyer and economist whose research focuses on environmental policy, Dr. Bacow's passion for the environment complements our long-standing commitment to global corporate responsibility. In addition to serving on our Board, Dr. Bacow is on the Board of Overseers of TIAA-CREF, a national financial services organization, and is a director of Liquidnet Holdings, Inc., a global institutional trading network, and Loews Corporation, serving on the audit committee of both Boards. Dr. Bacow is a Fellow of the American Academy of Arts and Sciences and the recipient of five honorary degrees. During the past five years, Dr. Bacow served as a director of Boston Properties, Inc., a publicly traded real estate investment trust.

63.     Upon information and belief, Defendant Bacow is a resident of Massachusetts.

**Defendant Benjamin**

64.     Defendant Gerald A. Benjamin ("Benjamin") has served as a Company director since 1988, and as Executive Vice President and Chief Administrative Officer of the Company since 2000. He also serves as a member of the Company's Executive Management Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Benjamin beneficially owned 44,178 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Benjamin owned approximately $2,600,758 worth of Henry Schein stock.

65.     For the fiscal year ended December 31, 2018, Defendant Benjamin received $2,651,809 in compensation from the Company. This included $582,096 in salary, a $30,000 bonus, $1,275,000 in stock awards, $682,466 in non-equity incentive plan compensation, and $82,247 in all other compensation.

66.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Benjamin made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 12/17/2013 | 41,664 | $111.93 | $4,663,326 |
| 6/2/2014 | 12,354 | $119.50 | $1,476,303 |
| 2/12/2015 | 22,116 | $142.79 | $3,157,943 |
| 6/2/2016 | 9,991 | $175.07 | $1,749,124 |
| 5/11/2017 | 12,578 | $175.10 | $2,202,407 |

67.     Thus, in total, before the fraud was exposed, he sold 98,703 Company shares on inside information, for which he received over $13.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

68.     The Company's 2019 Proxy Statement stated the following about Defendant Benjamin:

> **GERALD A. BENJAMIN** has been with the Company since 1988, in his current position as Executive Vice President and Chief Administrative Officer since 2000 and a director since 1994. He is also a member of our Executive Management Committee. Prior to holding his current position, Mr. Benjamin was Senior Vice President of Administration and Customer Satisfaction from 1993 to 2000. Mr. Benjamin was Vice President of Distribution Operations from 1990 to 1992 and Director of Materials Management from 1988 to 1990. Before joining the Company in 1988, Mr. Benjamin was employed for 12 years at Estée Lauder, Inc. in various management positions, where his last position was Director of Materials Planning and Control. Mr. Benjamin brings experience to the Company's Board of Directors in the areas of global services, human resources, operations and leadership. Mr. Benjamin directs our Global Services functions in North America, South America, Europe, Asia, Australia and New Zealand. These functions include all aspects of the supply chain (distribution, inventory management and transportation for over 3.5 million square feet of distribution space), human resources (for more than 18,000 employees in 31 countries), information services, customer services, security and financial operations.

69.     Upon information and belief, Defendant Benjamin is a resident of New York.

**Defendant Breslawski**

70.     Defendant James P. Breslawski ("Breslawski") has served as a Company director since 1992, as President of the Company since 2005, and as Vice Chairman of the Company since March 2018. He also serves as a member of the Company's Executive Management Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Breslawski beneficially owned 156,720 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Breslawski owned approximately $9,226,106 worth of Henry Schein stock.

71.     For the fiscal year ended December 31, 2018, Defendant Breslawski received $2,752,351 in compensation from the Company. This included $737,654 in salary, a $50,000

bonus, $1,360,000 in stock awards, $516,408 in non-equity incentive plan compensation, and $88,289 in all other compensation.

72.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Breslawski made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/11/2013 | 37,500 | $89.87 | $3,370,125 |
| 12/17/2013 | 57,754 | $111.95 | $6,465,560 |
| 3/11/2014 | 72,642 | $119.70 | $8,695,029 |
| 3/17/2015 | 9,359 | $139.55 | $1,306,048 |
| 3/18/2015 | 3,452 | $139.17 | $480,414 |
| 3/3/2016 | 7,166 | $167.51 | $1,200,376 |
| 3/6/2017 | 8,486 | $170.35 | $1,445,590 |

73.     Thus, in total, before the fraud was exposed, he sold 196,359 Company shares on inside information, for which he received over $22.9 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

74.     The Company's 2019 Proxy Statement stated the following about Defendant Breslawski:

*JAMES P. BRESLAWSKI* has been with the Company since 1980, in his current position as Vice Chairman since March 2018, President since 2005 and as a director since 1992. He is also a member of our Executive Management Committee. Mr. Breslawski held the position of Chief Executive Officer of our Global Dental Group from 2005 to March 2018. He also held the position of Executive Vice President and President of U.S. Dental from 1990 to 2005, with primary responsibility for the North American Dental Group. Between 1980 and 1990, Mr. Breslawski held various positions with us, including Chief Financial Officer, Vice President of Finance and Administration and Corporate Controller. Mr. Breslawski partners with our senior leadership team to address corporate and strategic priorities. Mr. Breslawski brings to the Company's Board of Directors management and leadership experience. The Board of Directors is aided by

Mr. Breslawski's understanding of the health care business and his keen business acumen, leadership ability and interpersonal skills. Mr. Breslawski has served as Chairman of the board of directors of the American Dental Trade Association, Chairman of the board of directors of the Dental Trade Alliance Foundation and President of the Dental Dealers of America. He is also a member of the Leadership Council, School of Dental Medicine at Harvard University, a former board member of the Dental Life Network (formerly the National Foundation of Dentistry for the Handicapped), a former member of the Board of Governors for St. John's University and a former trustee of Long Island University. Mr. Breslawski is also a Certified Public Accountant.

75.     Upon information and belief, Defendant Breslawski is a resident of New York.

**Defendant Brons**

76.     Defendant Paul Brons ("Brons") has served as a Company director since 2005. He also serves as a member of the Company's Strategic Advisory Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Brons beneficially owned 19,646 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Brons owned approximately $1,156,560 worth of Henry Schein stock.

77.     For the fiscal year ended December 31, 2018, Defendant Brons received $265,900 in compensation from the Company. This included $80,500 in fees earned or paid in cash and $185,400 in stock awards.

78.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Brons made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/12/2014 | 15,000 | $115.06 | $1,725,900 |
| 5/15/2014 | 5,363 | $113.77 | $610,148 |
| 2/12/2015 | 9,835 | $142.35 | $1,399,982 |
| 5/6/2015 | 3,801 | $136.81 | $519,995 |
| 5/23/2016 | 3,282 | $169.91 | $557,644 |

| 8/29/2016 | 3,381 | $164.03 | $554,585 |
| 3/13/2017 | 5,182 | $171.57 | $889,075 |

79.     Thus, in total, before the fraud was exposed, he sold 45,844 Company shares on inside information, for which he received over $6.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

80.     The Company's 2019 Proxy Statement stated the following about Defendant Brons:

*PAUL BRONS* has been a director since 2005. Between 1994 and 2002, Mr. Brons served as an executive board member of Akzo Nobel, N.V. From 1965 to 1994, Mr. Brons held various positions with Organon International BV, including President from 1983 to 1994 and Deputy President from 1979 to 1983. From 1975 to 1979, Mr. Brons served as the General Manager of the OTC operations of Chefaro, and from 1965 to 1975 in marketing and general management functions for Organon in various Middle East and Latin American countries. Both Organon and Chefaro operated within the Akzo Nobel group. Mr. Brons brings to the Company's Board of Directors knowledge of the pharmaceutical industry and experience with international business operations and relations. The Board of Directors is also aided by Mr. Brons' knowledge of European business culture and his strategic focus on European health care issues. Mr. Brons was honored in 1996 by Her Majesty the Queen with the decoration of Knight of the Order of Lion of the Kingdom of the Netherlands, the country's highest civilian order, conferred for his meritorious achievements for Akzo Nobel and other international activities.

81.     Upon information and belief, Defendant Brons is a resident of New York.

**Defendant Goodman**

82.     Defendant Shira Goodman ("Goodman") has served as a Company director since May 2018. She also serves a member of the Company's Nominating and Governance Committee and Strategic Advisory Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Goodman beneficially owned 1,070 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Goodman owned approximately $62,990 worth of Henry Schein stock.

83. For the fiscal year ended December 31, 2018, Defendant Goodman received $234,373 in compensation from the Company. This included $48,973 in fees earned or paid in cash and $185,400 in stock awards.

84. The Company's 2019 Proxy Statement stated the following about Defendant Goodman:

> **SHIRA GOODMAN** has been a director since May 2018. Ms. Goodman currently serves as an Advisory Director for Charlesbank Capital Partners, LLC. Ms. Goodman was the Chief Executive Officer of Staples, Inc. from 2016 to January 2018 (including as President and interim CEO from June 2016 to September 2016). Ms. Goodman served in roles with increasing responsibility at Staples since joining in 1992, including President, North American Operations from January 2016 to June 2016, and President, North American Commercial from 2014 to June 2016. Prior to that, she served as Executive Vice President of Global Growth from 2012 to 2014, Executive Vice President of Human Resources from 2009 to 2012, Executive Vice President of Marketing from 2001 to 2009, and in various other management positions. Prior to Staples, Ms. Goodman worked at Bain & Company from 1986 to 1992, in project design, client relationships and case team management. While at Bain, Ms. Goodman championed the company's initial business plan for its business-to-business delivery strategy. The Company values Ms. Goodman's extensive experience in business operations, marketing, sales force management, business growth and distribution logistics. Additionally, the Board of Directors values Ms. Goodman's knowledge of compensation and corporate governance matters. Ms. Goodman was listed in Fortune magazine's Most Powerful Women in 2017. Ms. Goodman currently serves as a director of CarMax Inc. (and is Chair of its nominating and governance committee). During the past five years, Ms. Goodman served as a director of Staples, Inc.

85. Upon information and belief, Defendant Goodman is a resident of Massachusetts.

**<u>Defendant Herring</u>**

86. Defendant Joseph L. Herring ("Herring") has served as a Company director since 2016. He also serves as the Chair of the Company's Regulatory, Compliance and Cybersecurity Committee, and as a member of the Compensation Committee and Strategic Advisory Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Herring beneficially owned 5,780 shares of the Company's common stock. Given that the price per share of the

Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Herring owned approximately $340,268 worth of Henry Schein stock.

87.     For the fiscal year ended December 31, 2018, Defendant Herring received $291,400 in compensation from the Company. This included $106,000 in fees earned or paid in cash and $185,400 in stock awards.

88.     The Company's 2019 Proxy Statement stated the following about Defendant Herring:

> *JOSEPH L. HERRING* has been a director since 2016. From 2005 to 2015, Mr. Herring served as Chief Executive Officer of Covance Inc., a drug development services company, and as Chairman of the board of directors of Covance from 2006 until its acquisition by Laboratory Corporation of America, Inc. in 2015. Mr. Herring previously served in several executive roles with Covance, including President and Chief Operating Officer, President of Early Development Services and Corporate Vice President and General Manager for its North American Preclinical Operations. Prior to joining Covance, Mr. Herring held a variety of senior leadership positions with Caremark International and American Hospital Supply Corporation over the course of his 19 years with the combined companies. The Company's Board of Directors values Mr. Herring's more than 35 years of experience in the healthcare industry. Mr. Herring also brings to the Company's Board of Directors comprehensive knowledge in pharmaceuticals, management, sales and corporate governance matters. Mr. Herring currently serves on the nonprofit board for University Medical Center of Princeton and previously served on the board of the Association of Clinical Research Organizations, of which he served as chairman. During the past five years, Mr. Herring served as a director of Covance Inc. and Team Health Holdings Inc.

89.     Upon information and belief, Defendant Herring is a resident of Pennsylvania.

**Defendant Kabat**

90.     Defendant Donald J. Kabat ("Kabat") served as a Company director from 1996 until he stepped down on May 31, 2018. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Kabat beneficially owned 29,815 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Kabat owned approximately $1,755,209 worth of Henry Schein stock.

91.     For the fiscal year ended December 31, 2018, Defendant Kabat received $240,224 in compensation from the Company. This included $54,824 in fees earned or paid in cash and $185,400 in stock awards.

92.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Kabat made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/8/2013 | 4,038 | $90.00 | $363,420 |
| 8/12/2013 | 2,500 | $106.25 | $265,625 |
| 2/12/2014 | 2,500 | $114.94 | $287,350 |
| 3/4/2014 | 5,000 | $119.15 | $595,750 |
| 5/19/2014 | 5,000 | $116.30 | $581,500 |
| 2/12/2015 | 5,000 | $142.68 | $713,400 |
| 3/10/2015 | 2,002 | $138.00 | $276,276 |
| 3/10/2016 | 1,218 | $168.38 | $205,086 |
| 2/27/2017 | 4,334 | $173.62 | $752,469 |
| 3/9/2017 | 1,993 | $171.58 | $341,958 |

93.     Thus, in total, before the fraud was exposed, he sold 33,585 Company shares on inside information, for which he received over $4.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

94.     The Company's 2017 Proxy Statement stated the following about Defendant Kabat:

**DONALD J. KABAT** has been a director since 1996. Mr. Kabat was the Chief Financial Officer of Central Park Skaters, Inc. from 1992 to 1995 and the President of D.J.K. Consulting Services, Inc. from 1995 to 2006. From 1970 to 1992, Mr. Kabat was a partner in Andersen Consulting (now known as Accenture PLC Ireland), where he practiced a broad array of specialty services including organization, profit improvement, process re-engineering and cost justification studies. With his prior experience as a Certified Public Accountant and partner at a global accounting firm, Mr. Kabat brings to the Company's Board of Directors strong skills in corporate finance, accounting and risk management. During his

consulting career with Andersen Consulting, Mr. Kabat helped launch an entirely new practice specialty called Change Management Services, which focused on human resource management encompassing methods to maintain continuous alignment of strategy, operations, culture and rewards. He was the recipient of the "Bravos" award for outstanding contribution to the Change Management practice. He has made numerous speeches, written articles and contributed chapters to specialized books (e.g., Budgeting: Key to Planning and Control; Management Controls for Professional Firms and The Change Management Handbook). Mr. Kabat also serves on the boards, and chairs committees, of several not-for-profit organizations.

95.    Upon information and belief, Defendant Kabat is a resident of New York.

**Defendant Kuehn**

96.    Defendant Kurt P. Kuehn ("Kuehn") has served as a Company director since 2016. He also serves as the Chairperson of the Company's Audit Committee, and as a member of the Regulatory, Compliance and Cybersecurity Committee and the Technology Advisory Board. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Kuehn beneficially owned 6,246 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Kuehn owned approximately $367,702 worth of Henry Schein stock.

97.    For the fiscal year ended December 31, 2018, Defendant Kuehn received $291,103 in compensation from the Company. This included $105,703 in fees earned or paid in cash and $185,400 in stock awards.

98.    The Company's 2019 Proxy Statement stated the following about Defendant Kuehn:

> **KURT P. KUEHN** has been a director since 2016. He is also a member of our Technology Advisory Board. Mr. Kuehn was Chief Financial Officer of United Parcel Service, Inc. ("UPS"), a global leader in logistics, from 2008 until 2015. Prior to his appointment as CFO, Mr. Kuehn was Senior Vice President Worldwide Sales and Marketing, leading the transformation of the sales organization to improve the global customer experience. Mr. Kuehn was UPS' first Vice President of Investor Relations, taking the company public in 1999 in one of the largest IPOs

in U.S. history. Since he joined UPS as a driver in 1977, Mr. Kuehn's UPS career included leadership roles in sales and marketing, engineering, operations and strategic cost planning. He was also a member of UPS' corporate sustainability steering committee, sponsored UPS' first sustainability report and supported the sustainability activities of UPS for over 10 years. Mr. Kuehn is also a director at NCR Corporation (and is Chair of its audit committee and a member of its executive committee). Mr. Kuehn brings to the Company's Board of Directors extensive experience with distribution logistics, and as the CFO of UPS for eight years, comprehensive knowledge in corporate finance and accounting. Additionally, the Board of Directors values Mr. Kuehn's insights in strategic cost planning, corporate social responsibility and the needs of global customers. Mr. Kuehn was awarded the 2015 E3 Lifetime Service Award for sustainability support by the Metro Atlanta Chamber and the 2013 C.K. Prahalad Award for Global Business Sustainability Leadership from the Corporate Eco Forum. Additionally, Mr. Kuehn has published several articles on sustainability in various journals including co-authoring an article on the financial case for sustainability titled Sustainability a CFO Can Love (published in the Harvard Business Review). Mr. Kuehn is currently an active member of the Standards Board of the Sustainability Accounting Standards Board (SASB).

99.     Upon information and belief, Defendant Kuehn is a resident of New York.

**Defendant Laskawy**

100.     Defendant Philip A. Laskawy ("Laskawy") has served as a Company director since 2002, and as the Company's lead director since 2012. He also serves as the Chairperson of the Company's Nominating and Governance Committee, and as a member of the Audit Committee. Defendant Laskawy additionally serves on the board of directors of Covetrus. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Laskawy beneficially owned 54,117 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Laskawy owned approximately $3,185,867 worth of Henry Schein stock.

101.     For the fiscal year ended December 31, 2018, Defendant Laskawy received $314,400 in compensation from the Company. This included $129,000 in fees earned or paid in cash and $185,400 in stock awards.

102.   During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Laskawy made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/23/2013 | 21,637 | $103.59 | $2,241,376 |
| 2/12/2014 | 5,851 | $114.91 | $672,338 |
| 9/2/2014 | 15,438 | $119.40 | $1,843,297 |
| 3/11/2015 | 2,669 | $136.60 | $364,580 |
| 9/16/2015 | 4,000 | $136.20 | $544,796 |
| 3/4/2016 | 1,317 | $166.88 | $219,780 |
| 3/3/2017 | 2,086 | $171.23 | $357,185 |
| 3/8/2017 | 1,103 | $171.51 | $189,175 |

103.   Thus, in total, before the fraud was exposed, he sold 54,101 Company shares on inside information, for which he received over $6.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

104.   The Company's 2019 Proxy Statement stated the following about Defendant Laskawy:

*PHILIP A. LASKAWY* has been a director since 2002 and has served as our Lead Director since 2012. Mr. Laskawy joined the accounting firm of Ernst & Young LLP (now known as EY LLP) in 1961 and served as a partner in the firm from 1971 to 2001, when he retired. Mr. Laskawy served in various senior management positions at Ernst & Young, including Chairman and Chief Executive Officer, to which he was appointed in 1994. Mr. Laskawy currently serves on the board of directors of Covetrus, Inc. (and serves as the lead independent director and as a member of its nominating and governance committee), Lazard Ltd. (and is Chairman of its audit committee and is a member of its compensation committee) and Loews Corporation (and is a member of its audit committee). As a Certified Public Accountant with over 50 years of experience, Mr. Laskawy brings to the Company's Board of Directors exceptional skills in corporate finance and accounting, corporate governance, compliance, disclosure and international business conduct. Mr. Laskawy served on the American Institute of Certified Public Accountants to review and update rules regarding auditor independence. In

2006 and 2007, he served as Chairman and Vice Chairman of the International Accounting Standards Committee Foundation, which was created by the Securities and Exchange Commission and sets accounting standards in more than 100 countries, and he served as a member of the 1999 Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees. During the past five years, Mr. Laskawy was the Non-Executive Chairman of Federal National Mortgage Association (Fannie Mae).

105.    Upon information and belief, Defendant Laskawy is a resident of Connecticut.

**Defendant Margulies**

106.    Defendant Anne H. Margulies ("Margulies") has served as a Company director since May 2018. She also serves as a member of the Company's Audit Committee and Regulatory, Compliance and Cybersecurity Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Margulies beneficially owned 2,749 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Margulies owned approximately $161,833 worth of Henry Schein stock.

107.    For the fiscal year ended December 31, 2018, Defendant Margulies received $232,873 in compensation from the Company. This included $47,473 in fees earned or paid in cash and $185,400 in stock awards.

108.    The Company's 2019 Proxy Statement stated the following about Defendant Margulies:

> ***ANNE H. MARGULIES*** has been a director since May 2018. She is also a member of our Technology Advisory Board. Ms. Margulies has been the Vice President and Chief Information Officer for Harvard University since 2010. She is responsible for information technology strategy, policies and services for the university. Prior to that, she was the Assistant Secretary for Information Technology and Chief Information Officer for the Commonwealth of Massachusetts from 2007 to 2010, responsible for the strategy, policies and overall management of information technology across the state's government. With information technology playing an increasingly important role in the Company's business, the Board of Directors values Ms. Margulies' more than 35 years of information security expertise

(including cybersecurity) and strategic information technology leadership. Ms. Margulies has been a member of the Massachusetts Technology Collaborative Board since 2012. In 2015, Ms. Margulies was named 2015 Boston CIO Leader of the Year by the Boston Business Journal along with the Boston CIO Leadership Association and in 2017, she was named by IDG Enterprises to the 2017 CIO Hall of Fame in CIO Magazine.

109.    Upon information and belief, Defendant Margulies is a resident of Massachusetts.

**Defendant Mashima**

110.    Defendant Karyn Mashima ("Mashima") served as a Company director from 2008 until she stepped down on May 28, 2014.

111.    For the fiscal year ended December 31, 2014, Defendant Mashima received $211,230 in compensation from the Company. This included $25,830 in fees earned or paid in cash and $185,400 in stock awards.

112.    The Company's Schedule 14A filed with the SEC on April 14, 2014 (the "2014 Proxy Statement"), stated the following about Defendant Mashima:

*KARYN MASHIMA* has been a director since 2008. Ms. Mashima, a private consultant, served as the Senior Vice President, Strategy and Technology of Avaya Inc. from 2000 to 2009. Prior to holding such position at Avaya, from 1994 to 2000, Ms. Mashima held similar positions with the Enterprise Communications unit of Lucent Technologies and AT&T. Ms. Mashima was Vice President of Marketing at Proteon Technologies, Inc. from 1992 to 1994 and Vice President of Marketing at Network Equipment Technologies, Inc. from 1990 to 1992. From 1984 to 1990, Ms. Mashima was Product and Marketing Manager at Hewlett-Packard Company. From 1981 to 1984, Ms. Mashima was employed at Xerox Corp., where her last position was Product Manager of Xerox's Office Systems division. Ms. Mashima brings to the Company's Board of Directors extensive executive experience with respect to technology strategies, business planning, market assessment, product development and competitive analysis. With technology (including value-added services) being one of the Company's key business groups, the Board of Directors values Ms. Mashima's insight regarding future technological needs of the Company, particularly as the health care industry continues to expand into electronic health records. Additionally, Ms. Mashima has extensive experience in mergers and acquisitions and international business operations and relations. Ms. Mashima is a recognized industry leader, and frequently presents at major industry conferences. She was named a Woman of Influence for 2005 by NJBiz magazine and to the First Annual List of Tech Women to Watch by the

executive search firm Christian & Timbers. Ms. Mashima is a member of Women's Corporate Directors International).

113.   Upon information and belief, Defendant Mashima is a resident of New York.

**Defendant Matthews**

114.   Defendant Norman S. Matthews ("Matthews") served as a Company director from 2002 until he stepped down on May 31, 2016.

115.   For the fiscal year ended December 31, 2016, Defendant Matthews received $287,961 in compensation from the Company. This included $44,319 in fees earned or paid in cash and $185,400 in stock awards.

116.   During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Matthews made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 8/22/2013 | 9,851 | $103.96 | $1,024,109 |
| 5/28/2014 | 6,637 | $118.68 | $787,679 |
| 11/14/2014 | 15,438 | $129.54 | $1,999,838 |
| 2/12/2015 | 3,308 | $142.56 | $471,588 |
| 3/13/2015 | 9,200 | $136.53 | $1,256,122 |
| 3/14/2016 | 5,335 | $167.76 | $894,999 |

117.   Thus, in total, before the fraud was exposed, he sold 49,769 Company shares on inside information, for which he received over $6.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

118.   The Company's Schedule 14A filed with the SEC on April 24, 2015 (the "2015 Proxy Statement"), stated the following about Defendant Matthews:

***NORMAN S. MATTHEWS*** has been a director since 2002. Since 1989, Mr. Matthews has worked as an independent consultant and venture capitalist. From 1978 to 1988, Mr. Matthews served in various senior management positions for Federated Department Stores, Inc., including President from 1987 to 1988. Mr. Matthews currently serves on the Board of Directors of Duff & Phelps Corp., Party City Holdings, Inc., Spectrum Brands, Inc. (as Chairman of its nominating and governance committee) and as Chairman of the Board of The Children's Place Retail Stores, Inc. Mr. Matthews brings to the Company's Board of Directors extensive experience in strategic marketing and sales with over 30 years of experience as a senior business leader in marketing and merchandising at large public companies and valuable expertise in compensation programs and strategy. In 2005, Mr. Matthews was named as one of eight outstanding directors by the Outstanding Directors Exchange (an annual award voted on by peer directors and awarded to an outstanding director for the key role he played during a crisis, business transformation or turnaround). During the past five years, Mr. Matthews served on the Boards of Directors of The Progressive Corporation, Finlay Enterprise, Inc. and Finlay Fine Jewelry Corporation.

119.    Upon information and belief, Defendant Matthews is a resident of New York.

**Defendant Mlotek**

120.    Defendant Mark E. Mlotek ("Mlotek") has served as a Company director since 1995, and as Executive Vice President and Chief Strategic Officer of the Company since 2012. He also serves as a member of the Company's Executive Management Committee and the Technology Advisory Board. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Mlotek beneficially owned 35,698 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Mlotek owned approximately $2,101,541 worth of Henry Schein stock.

121.    For the fiscal year ended December 31, 2018, Defendant Mlotek received $2,483,724 in compensation from the Company. This included $582,096 in salary, a $25,000 bonus, $1,190,000 in stock awards, $615,426 in non-equity incentive plan compensation, and $71,202 in all other compensation.

122.   During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Mlotek made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 3/8/2013 | 1,451 | $90.16 | $130,822 |
| 3/11/2013 | 9,110 | $89.43 | $814,707 |
| 12/19/2013 | 22,004 | $112.22 | $2,469,222 |
| 2/25/2014 | 20,333 | $119.16 | $2,422,880 |
| 11/7/2014 | 6,262 | $128.75 | $806,201 |
| 2/12/2015 | 6,875 | $142.55 | $980,031 |
| 11/5/2015 | 2,952 | $155.00 | $457,560 |
| 11/3/2016 | 2,417 | $155.19 | $375,094 |
| 3/17/2017 | 5,559 | $170.98 | $950,477 |

123.   Thus, in total, before the fraud was exposed, he sold 76,963 Company shares on inside information, for which he received over $9.4 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

124.   The Company's 2019 Proxy Statement stated the following about Defendant Mlotek:

> **MARK E. MLOTEK** has been with the Company since 1994, in his current position as Executive Vice President and Chief Strategic Officer since 2012 and as a director since 1995. He is also a member of our Executive Management Committee and our Technology Advisory Board. Mr. Mlotek was Senior Vice President and subsequently Executive Vice President of the Corporate Business Development Group between 2000 and 2012. Prior to that, Mr. Mlotek was Vice President, General Counsel and Secretary from 1994 to 1999. Prior to joining the Company, from 1989 to 1994, Mr. Mlotek was a partner in the law firm of Proskauer Rose LLP, the Company's principal law firm and one of the largest firms in the nation, specializing in mergers and acquisitions, corporate reorganizations and tax law. As the Company continues to grow through strategic acquisitions, the Board of Directors values Mr. Mlotek's extensive legal, merger and acquisition and business development experience as well as his drive for innovation and his entrepreneurial

spirit. Mr. Mlotek also manages the Company's important supplier partnership arrangements and global strategic planning function.

125.    Upon information and belief, Defendant Mlotek is a resident of New York.

**Defendant Raphael**

126.    Defendant Carol Raphael ("Raphael") has served as a Company director since 2012. She also serves as a member of the Company's Strategic Advisory Committee and the Regulatory, Compliance and Cybersecurity Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Raphael beneficially owned 15,904 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Raphael owned approximately $936,268 worth of Henry Schein stock.

127.    For the fiscal year ended December 31, 2018, Defendant Raphael received $271,900 in compensation from the Company. This included $86,500 in fees earned or paid in cash and $185,400 in stock awards.

128.    The Company's 2019 Proxy Statement stated the following about Defendant Raphael:

> ***CAROL RAPHAEL*** has been a director since 2012. Ms. Raphael currently serves as a Senior Advisor for Manatt Health Solutions, the interdisciplinary policy and business advisory division of Manatt, Phelps & Phillips, L.L.P., a leading law firm in the United States. Ms. Raphael served as the President and Chief Executive Officer of the Visiting Nurse Service of New York from 1989 to 2011. Prior to the Visiting Nurse Service of New York, Ms. Raphael held executive positions at Mt. Sinai Medical Center and in New York City government. Ms. Raphael served on the Federal Bipartisan Commission on Long Term Care, the Medicare Payment Advisory Commission (MedPAC), the New York State Medicaid Redesign Team and was an Advanced Leadership Fellow at Harvard University. She is the Chair of the board of the Long Term Quality Alliance and a board member of the New York eHealth Collaborative, which is implementing a statewide, standardized platform for the exchange of health information. She also was the Chair of the national AARP board and co-chaired the West Health Advisory Council on Emergency Department to Home-Based Healthcare. As a nationally recognized industry leader,

Ms. Raphael brings to the Company's Board of Directors extensive knowledge and experience in health policy, economics, management, clinical services, home healthcare and new models of integrated care (particularly for chronically ill and long term care populations). Ms. Raphael's strategic insights into the health care needs of an aging population and her invaluable experience advancing the adoption of health information technology is valued by the Company, especially in connection with its strategic plan for growth and innovative solutions. Ms. Raphael currently serves on several non-profit boards including: the Primary Care Development Corporation; the Medicare Rights Center; the SCAN Foundation; the Commonwealth Care Alliance; and the Kaiser Permanente School of Medicine. Ms. Raphael is also a member of several advisory boards including the Harvard T.H. Chan School of Public Health's Policy and Management Executive Council, the New York City Age-Friendly Commission, the New York State Quality Advisory Committee and Honor Technology, Inc.'s Advisory Board. Ms. Raphael co-edited the book "Home Based Care for a New Century", was a Visiting Fellow at the King's Fund in the United Kingdom and was listed in Crain's New York Business 50 Most Powerful Women in 2009. Ms. Raphael is currently a member of The RAND Corporation's RAND Health Board of Advisors.

129.    Upon information and belief, Defendant Raphael is a resident of New York.

**Defendant Rekow**

130.    Defendant E. Dianne Rekow ("Rekow") has served as a Company director since 2014. She also serves as a member of the Company's Strategic Advisory Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Rekow beneficially owned 14,203 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Rekow owned approximately $836,130 worth of Henry Schein stock.

131.    For the fiscal year ended December 31, 2018, Defendant Rekow received $272,123 in compensation from the Company. This included $86,723 in fees earned or paid in cash and $185,400 in stock awards.

132.    The Company's 2019 Proxy Statement stated the following about Defendant Rekow:

**E. DIANNE REKOW, DDS, PH.D.** has been a director since 2014. Dr. Rekow was Dean of the Dental Institute at King's College London and Professor of Orthodontics from 2012 through 2016. From 2002 to 2012, Dr. Rekow was a Professor of Orthodontics at New York University (NYU), during which time she was Senior Vice Provost of Engineering Technology at NYU (from 2008 to 2012) and was Provost of Polytechnic Institute of NYU (from 2009 to 2012). Dr. Rekow has been President of both the International Association for Dental Research and the American Association of Dental Research and, from 2000 to 2011, was an American Dental Association Consultant to the Council on Scientific Affairs. In 2012, she was elected to the Faculty of Dental Surgery of the Royal College of Surgeons (England). Dr. Rekow is an internationally known authority on the performance of new materials and products for use in aesthetic and restorative dentistry and was one of the early pioneers in digital dentistry, capitalizing on her engineering education and industry experience. Dr. Rekow's team has also carried out research into the use of bio-engineered tissue to facilitate bone replacement in people who have been disfigured by disease or developmental defects. Dr. Rekow holds a number of patents in the dental field and is the author of, or contributor to, more than one hundred publications. Dr. Rekow brings to the Company's Board of Directors extensive experience with dental product development and knowledge of innovative clinical dental practices. Additionally, the Board of Directors values Dr. Rekow's insights into the needs of future dental practitioners and the global dental industry.

133.    Upon information and belief, Defendant Rekow is a resident of the United Kingdom.

**Defendant Sheares**

134.    Defendant Bradley T. Sheares ("Sheares") has served as a Company director since 2010. He also serves as the Chairperson of the Company's Strategic Advisory Committee, and as a member of the Compensation Committee and the Nominating and Governance Committee. According to the 2019 Proxy Statement, as of March 25, 2019, Defendant Sheares beneficially owned 30,850 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 25, 2019 was $58.87, Defendant Sheares owned approximately $1,816,139 worth of Henry Schein stock.

135.    For the fiscal year ended December 31, 2018, Defendant Sheares received $282,177 in compensation from the Company. This included $96,777 in fees earned or paid in cash and $185,400 in stock awards.

136.    During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Sheares made the following sale of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|---|---|---|---|
| 2/23/2017 | 740 | $172.12 | $127,368 |

137.    His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

138.    The Company's 2019 Proxy Statement stated the following about Defendant Sheares:

> **BRADLEY T. SHEARES, PH.D.** has been a director since 2010. Dr. Sheares served as Chief Executive Officer of Reliant Pharmaceuticals, Inc., from January 2007 through its acquisition by GlaxoSmithKline plc in December 2007. Prior to joining Reliant, from 2001 until 2006, Dr. Sheares served as President of U.S. Human Health for Merck & Co. As a member of Merck's management committee, Dr. Sheares had responsibility for formulating global business strategies, operations management and the development and implementation of corporate policies. As the former Chief Executive Officer of Reliant Pharmaceuticals and with 20 years in the pharmaceutical industry, Dr. Sheares brings to the Company's Board of Directors extensive health care knowledge and experience in sales, marketing, brand management, research and development, complex regulatory and legal issues, risk management and mergers and acquisitions. As a director of other public companies, Dr. Sheares has been involved in succession planning, compensation, employee management and the evaluation of acquisition opportunities. During the past five years, Dr. Sheares served as a director of Covance Inc., Honeywell International, Inc. and The Progressive Corporation.

139.    Upon information and belief, Defendant Sheares is a resident of New York.

**Defendant L. Sullivan**

140.    Defendant Louis W. Sullivan ("L. Sullivan") served as a Company director from 2003 until he stepped down on May 31, 2016.

141.    For the fiscal year ended December 31, 2016, Defendant L. Sullivan received $280,697 in compensation from the Company. This included $37,055 in fees earned or paid in cash and $185,400 in stock awards.

142.    During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant L. Sullivan made the following sales of Company stock:

| Date | Number of Shares | Price Per Share | Proceeds |
|------|------------------|-----------------|----------|
| 8/20/2013 | 15,000 | $103.91 | $1,558,650 |
| 5/13/2014 | 1,638 | $116.00 | $189,999 |
| 8/29/2014 | 17,262 | $120.11 | $2,073,425 |
| 11/17/2015 | 15,622 | $154.24 | $2,409,459 |

143.    Thus, in total, before the fraud was exposed, he sold 49,522 Company shares on inside information, for which he received over $6.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

144.    The 2015 Proxy Statement stated the following about Defendant L. Sullivan:

**LOUIS W. SULLIVAN, M.D.** has been a director since 2003. Dr. Sullivan is President Emeritus of Morehouse School of Medicine. From 1981 to 1989 and from 1993 to 2002, Dr. Sullivan was President of Morehouse School of Medicine. From 1989 to 1993, Dr. Sullivan served as U.S. Secretary of Health and Human Services. Dr. Sullivan currently serves on the Board of Directors of United Therapeutics Corporation (as a member of its compensation committee, nominating and governance committee and scientific committee) and Emergent BioSolutions Inc. (as a member of its compensation committee, as a member of its nominating and corporate governance committee and as a member of its audit committee). As the Company continues to develop relationships with medical, dental and veterinary universities and seeks to be awarded governmental bids, Dr. Sullivan's extensive experience in government and governmental relations, in-depth knowledge of

health care and health care policy and inside view of health care in academia is extremely beneficial to the Board of Directors. Dr. Sullivan served as Chair of the President's Commission on Historically Black Colleges and Universities from 2002 to 2009, and was Co-chair of the President's Commission on HIV and AIDS from 2001 to 2006. Dr. Sullivan is the founding dean of Morehouse School of Medicine, the founding president of the Association of Minority Health Professions Schools and is a member of the boards of numerous charitable organizations. Dr. Sullivan is the recipient of more than 60 honorary degrees. During the past five years, Dr. Sullivan served on the Board of Directors of BioSante Pharmaceuticals, Inc.

145.    Upon information and belief, Defendant L. Sullivan is a resident of Georgia.

## **FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

146.    By reason of their positions as officers and/or directors of Henry Schein, and because of their ability to control the business and corporate affairs of Henry Schein, the Individual Defendants owed Henry Schein and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Henry Schein in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Henry Schein and its shareholders so as to benefit all shareholders equally.

147.    Each director and officer of the Company owes to Henry Schein and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

148.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Henry Schein, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

149.    To discharge their duties, the controlling shareholder, officers and directors of Henry Schein were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

150.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Henry Schein, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

151.    As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

152.    To discharge their duties, the officers and directors of Henry Schein were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Henry Schein were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States, and pursuant to Henry Schein's own Code of Ethics for Senior Financial Officers (the "Code of Ethics") and Worldwide Business Standards (the "Business Standards");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Henry Schein conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Henry Schein and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Henry Schein's operations would comply with all applicable laws and Henry Schein's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

153.    Each of the Individual Defendants further owed to Henry Schein and the shareholders the duty of loyalty requiring that each favor Henry Schein's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

154.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Henry Schein and were at all times acting within the course and scope of such agency.

155.    Because of their advisory, executive, managerial, and directorial positions with Henry Schein, each of the Individual Defendants had access to adverse, non-public information about the Company.

156.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Henry Schein.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

157.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

158.    The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

159.    The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Henry Schein was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

160.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

161.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants, and of Henry Schein, and was at all times acting within the course and scope of such agency.

## HENRY SCHEIN'S BUSINESS STANDARDS AND CODE OF ETHICS

162.    The Company's Business Standards state that the "[Business Standards] describe the ethical and legal responsibilities that all Team Schein Members are expected to uphold. Team Schein Members include employees and officers of Henry Schein and its subsidiaries and affiliates, and members of our Board of Directors."

163.    The Business Standards provide, as to "Compliance with Laws," that:

The first and foremost obligation of all Team Schein Members is to obey the laws of the countries and communities in which Henry Schein does business. Any case of noncompliance with applicable law may subject a Team Schein Member to disciplinary action up to and including termination of employment. The fact that in some countries certain conduct is legally prohibited, but these prohibitions are not enforced in practice, or their violation is not subject to public criticism or censure, will not excuse an illegal action by a Team Schein Member.

164.    The Business Standards provide, as to "Marketing and Sales Practices," that:

Henry Schein is confident in its ability to succeed in a fair, open, and competitive marketplace. Individuals responsible for merchandising, sales, marketing, and business development must be familiar with local, regional, and country-specific laws that govern advertising and competitive practices of the marketing industry. Product, service, and pricing claims or disclosures, or comparisons with competitors' products should be accurate.

165.    The Business Standards provide, as to "Antitrust Laws and Fair Competition," that:

Team Schein Members are expected to comply fully with all applicable antitrust laws in carrying out the business of the Company. Antitrust laws may affect a number of the activities of the Company, and Team Schein Members should be knowledgeable as to their impact in the day-to-day conduct of our business. Penalties for violations of the antitrust laws can be substantial and include fines and imprisonment. Penalties can be imposed on Henry Schein as well as on Team Schein Members who engage in illegal activities.

Under antitrust laws, agreements and conduct that restrict competition may be illegal. For example, agreements between competitors to fix prices for services or products, or to allocate customers or territories among competitors, are always illegal and should not be entered into by any Team Schein Member. In addition, due to the sensitive nature of these topics, Team Schein Members should not enter into discussions related to such matters with any competitors. Some types of arrangements, such as exclusivity arrangements with a supplier or customer, restrictions on the resale of items, arrangements that involve packaging the sale or

lease of one product based on the sale or lease of another, and pricing differently to competing customers may also have legal implications depending on the circumstances. Team Schein Members should consult with the General Counsel's office before engaging in activities that might have legal implications under the antitrust laws.

166.    The Business Standards provide, as to "Competitive Information," that:

Special care must be taken in business contacts with Henry Schein's competitors. Many of these contacts, such as attendance at business shows or trade seminars and participation in trade associations, are acceptable as long as proper procedures are followed. Team Schein Members who attend a professional or trade association meeting or belong to a trade association where it is possible that confidential or non-public information regarding the Company or its competitors may be discussed or made available should first clear such activities with the General Counsel's office.

Although it is in the Company's interests to obtain information about competitors, that information generally should not be obtained directly from the competitors themselves. Nor should any improper means be used to acquire a competitor's trade secrets or confidential information. Information about prices is especially sensitive. Although you may obtain published pricing information of competitors through normal publicly available channels, you should avoid discussing any price information with competitors or obtaining nonpublished price information from them.

In contacts with competitors, Team Schein Members should avoid discussing pricing policies or analyses, costs, profits or profit margins, inventories, market shares or markets, customers, distribution and supply practices, market surveys, and studies or any other competitive or proprietary information. Agreements on or discussions of these subjects with competitors can be illegal.

167.    The Business Standards provide, as to "Financial Reporting and Records," that:

Henry Schein has established and maintains a high standard of transparency, accuracy and completeness in the documentation and reporting of all financial information. Our financial records serve as the basis for managing our business and are important in meeting our obligations to colleagues, shareholders, and the public for full, fair, and understandable public reporting and communications. These records are also necessary for substantiation of compliance with tax, financial, and other reporting requirements.

All financial information must reflect actual transactions and conform to generally accepted accounting principles. All information relating to the Company's business must be reported and recorded accurately. No false or misleading entries may be made in the books and records of the Company, and Team Schein Members may

not engage in any arrangement that would result in such entries. No undisclosed or unrecorded funds or assets may be established.

Henry Schein maintains a system of internal controls to provide reasonable assurances that all transactions are executed in accordance with management's authorization and are properly accounted for and recorded. All Team Schein Members must take appropriate steps to ensure that their team members comply with these internal controls. No Team Schein Member shall, at any time, offer or provide to anyone monetary compensation, gifts, or kickbacks to obtain or transact business on behalf of the Company. Any Team Schein Member who believes that a payment is to be used for an improper purpose or who is aware of any action prohibited by the above, must promptly report the matter to the Team Schein Member's supervisor, the Chief Compliance Officer or any member of the Compliance Committee or Henry Schein's confidential Compliance Helpline (see inside back cover for further details).

168.    The Business Standards provide, as to the Company's "Prohibition on Insider Trading," that:

In the course of employment with Henry Schein, Team Schein Members may come into possession of confidential and highly sensitive information about Henry Schein or other publicly held companies. Much of this information has the potential to affect the market price of securities issued by the companies involved. National and state securities laws and regulations prohibit Team Schein Members from insider trading, i.e., purchasing or selling a security either personally or on behalf of others at a time when the person trading in that security possesses material, nonpublic information about the issuer of the security.

To limit the potential exposure of Henry Schein and Team Schein Members to insider trading liability, Team Schein Members should not discuss material nonpublic information except as required in confidential business meetings with those who require the information for their official duties. Team Schein Members should also safeguard computer and hard copy files containing material nonpublic information. In addition, certain Team Schein Members and their families are prohibited from buying or selling Henry Schein stock or other Henry Schein securities except during specified periods.

169.    The Business Standards provide, as to "Protecting Assets," that:

All Team Schein Members are entrusted with the care of numerous Company assets, and have a special responsibility to protect and judiciously utilize them. This includes not only cash and other financial assets, but also assets like facilities and equipment, inventory, computers, sensitive data, and supplies. An act by a Team Schein Member that involves theft, fraud, embezzlement, misuse or misappropriation of Company assets may subject the Team Schein Member to disciplinary action up to and including termination of employment.

170.    The Business Standards provide, as to "Records Retention," that:

Team Schein Members are responsible for maintaining the accuracy, confidentiality and security of all of their records. Henry Schein is subject to legal and regulatory requirements regarding the retention and disposal of records. In the event the Company receives any notice of pending or potential litigation, government investigation or government audit, Team Schein Members should note that the regular operation of Henry Schein's records retention policy, insofar as it covers disposal of records, should stop immediately. No Team Schein Member should ever, under any circumstances, destroy any Henry Schein record in anticipation or contemplation of a request for such records in litigation or from any governmental agency.

A Team Schein Member receiving information regarding pending or potential litigation, governmental investigation or audit should promptly notify the General Counsel's office.

171.    The Business Standards provide, as to "Regulatory Compliance," that:

Henry Schein is subject to a variety of national, state, and local regulations that are enforced by numerous agencies. These agencies include the Food and Drug Administration, the Drug Enforcement Administration, the Occupational Safety and Health Administration, the Department of Transportation, the Federal Aviation Administration, the Environmental Protection Agency, the Securities and Exchange Commission, and the Bureau of Customs and Border Protection in the United States, and comparable agencies in other countries.

Henry Schein depends on every Team Schein Member to uphold the Company's regulatory reputation. Whenever a Team Schein Member has any concerns about regulatory compliance, he or she should promptly inform a supervisor, or escalate to the Regulatory and Quality Affairs Department. They may also report violations to the Chief Compliance Officer's office or Henry Schein's confidential Compliance Helpline (see inside back cover for further details).

172.    Additionally, the Code of Ethics provides that the Company's CEO and CFO must:

(1)    maintain high standards of honest and ethical conduct and avoid any actual or apparent conflict of interest;

(2)    report to the Audit Committee of the Board of Directors any conflict of interest that may arise and any material transaction or relationship that reasonably could be expected to give rise to a conflict;

(3)    provide, or cause to be provided, full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with or submits to the Securities and Exchange Commission and in other public communications;

(4)     comply and take all reasonable actions to cause others to comply with applicable governmental laws, rules, and regulations; and

(5)     promptly report violations of this Code to the Audit Committee.

173.    In violation of the Business Standards, as well as the Code of Ethics with respect to Defendants Bergman and Paladino, the Individual Defendants conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and Sections 14(a), 10(b) and 20(a) of the Exchange Act. Moreover, 12 of the Individual Defendants violated the Business Standards by engaging in insider trading. Also in violation of the Business Standards, as well as the Code of Ethics with respect to Defendants Bergman and Paladino, the Individual Defendants failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

174.    Henry Schein is purportedly the largest distributor of healthcare products in the world. The Company serves over 1 million customers, which include dental practitioners, institutional healthcare facilities and clinics, laboratories, and other healthcare providers. The Company controls approximately 37.5% of the sale of dental products and services in the United States.

175.    Henry Schein's dental products and services business accounts for a majority of the Company's healthcare products distribution business, which itself comprises over 90% of the Company's overall business. For example, for the fiscal year ended December 31, 2017, Henry

Schein made over $6 billion in net sales of dental products, which accounted for approximately 48.5% of the Company's total net sales.

176.    In the dental supplies and equipment industry, manufacturers typically sell to distributors, who, in turn, sell a wide range of equipment and supplies to dental service providers at a healthy margin. As individual manufacturers do not produce the range of products necessary to run a dentistry practice, individual dentists typically purchase dental supplies and dental equipment through distributors such as Henry Schein.

177.    Henry Schein, along with its competitors, Benco and Patterson, collectively control about 85% of the sale of all dental products and services made through distributors in the United States.

178.    Due to economies of scale and the need to obtain products from certain manufacturers that produce a large proportion of the top-selling supplies to run a dentistry practice, there are significant barriers to entry to the distributor market.

179.    GPOs, or buying groups, are collectives of individual buyers who band together to negotiate better deals by buying as a group. According to Paul Lettieri ("Lettieri"), a Regional General Manager at Henry Schein between January 2014 and March 2018 cited in the 2018 Securities Class Action, it was well understood at Henry Schein that GPOs were a threat to the Company's dental business, and would ultimately push down the Company's margins.

### The Antitrust Conspiracy

180.    During the First Relevant Period, the Individual Defendants caused the Company, with Benco and Patterson, to engage in the Antitrust Conspiracy—a conspiracy in restraint of trade, whereby the companies agreed to refuse to offer discounted prices or otherwise negotiate with GPOs, agreed to fix margins on dental supplies and equipment, agreed not to poach one

another's customers or sales representatives, and agreed to block the entry and expansion of rival distributors. This agreement was made and enforced by senior executives at Benco, Patterson, and Henry Schein.

181.    Henry Schein, Patterson, Benco, and Burkhart Dental Supply Company ("Burkhart") were involved in an agreement not to compete on price. These distributors agreed to charge similar margins on dental supplies and equipment, and raised their margins in lockstep every year since 2005. Antitrust Order at 2.

182.    Mark Lowery ("Lowery"), a Henry Schein Regional Manager cited in the Antitrust Action Complaint, stated during a June 2008 industry meeting, that the margin-fixing practices that Henry Schein and other dental products distributors engaged in occurred "unanimously across the industry [for] as long as [Lowery had] been in the dental business." Specifically, Lowery stated the following:

> Well, you know, I think the—the big thing is—you know, it goes back to, I don't know that you have to necessarily buy the market. I don't think you do. I think, you know, that's the probably the number one issue for small companies. I mean, that's how they start getting market share and you know, that's—that's a way for them to sell a product, and we all have the ability to drop our drawers. You know we do. But, you know, I think that's—that's part of the—the mutual respect with Jack and us because we all know that . . . We all want to make a living. We want to—we all—all are going to sell it at a—at a good price where we all get paid.

Exhibit A at 18.[6]

183.    Since July 2012 and continuing at least into 2015, Henry Schein, Patterson, and Benco executives acted according to an agreement they entered into:[7]

> not to provide discounts to or otherwise contract with Buying Groups composed of independent dentists (the "agreement"). The agreement sought to prevent the

---

[6] References to the Antitrust Action Complaint refer to the second consolidated class action complaint filed in the Antitrust Action on October 22, 2016 (the "Antitrust Action Complaint"), attached hereto as Exhibit A, and which is incorporated by reference herein.

[7] The FTC Complaint alleges that Benco and Henry Schein entered into an agreement no later than July 2012, and Patterson joined the agreement in February 2013.

falling of prices charged by the Distributors to independent dentists. Senior executives of Benco, Schein, and Patterson entered into, ensured compliance with, and monitored the agreement through a series of private inter-firm communications. They also reaffirmed their conscious commitment to concerted action on various occasions.

Exhibit B at 8.[8]

184.    As Judge Chappell held, "the evidence proves that Benco and Patterson agreed to refuse to offer discounted prices to buying groups or otherwise negotiate with buying groups." FTC Decision at 97.

185.    A former Patterson employee cited in the Antitrust Action Complaint stated that during the period of time that he was responsible for dental sales, there was a nationwide policy not permitting sales of products below minimum gross margin thresholds (of 32% on equipment and 28-30% on supplies), and that it was known throughout the Company's sales division that Henry Schein also would not go below the same minimum gross margin thresholds. Exhibit A.

186.    According to the Antitrust Action Complaint, a former sales representative who worked for Patterson and then Benco from 2000 through 2014 learned about margin thresholds at both companies from management, in sales meetings, and training sessions—including handouts provided at monthly meetings, and stated that the minimum margins remained similar throughout his 15-year career as a sales representative.

187.    Henry Schein, Patterson, Benco, and Burkhart agreed not to pursue one another's existing or nearly consummated business by competing on price.

188.    Henry Schein, Patterson, Benco, and Burkhart agreed not to poach one another's sales representatives to enforce the agreement not to compete on price, as sales in their industry are relationship driven.

---

[8] References to the FTC Complaint refer to the unredacted public version of the complaint filed on March 14, 2018 (the "FTC Complaint"), attached hereto as Exhibit B, which is incorporated by reference herein.

189. Henry Schein, Patterson, Benco, and Henry Schein also boycotted entities that sought to enter the market and compete on price by using their power over manufacturers to force manufacturers to coerce new entrants to raise prices or face being cut off from purchasing products. Antitrust Order at 8.

190. According to the Antitrust Action Complaint, Henry Schein, Patterson, and Benco used their influence to force Instrumentarium, a dental equipment manufacturer, to deny requests from a distributor who competed on price to sell Instrumentarium products and to force a number of manufacturers to terminate their relationships with at least one price-competing distributor. Threats were made by Henry Schein, Patterson, Benco, and Burkhart that were sometimes made jointly on the same call, and most often coming on the same day within hours of each other, providing evidence of coordination. Further, when Instrumentarium allowed a price-competing distributor to make one final national sale before restricting the distributor to the State of Texas. That sale was to a dentist for whose business none of Henry Schein, Patterson, Benco, or Burkhart had submitted a bid.

191. According to the Antitrust Action Complaint, in 2015, in response to attempts by Amazon.com to enter the dental supply market, Patterson, Benco, and Henry Schein agreed to boycott manufacturers who supplied Amazon.com.

192. Henry Schein, Patterson, and Benco, according to the Antitrust Action Complaint, prevented online medical supply sellers from supplying dentists with products that cross over between dental and medical offices, resulting in such sellers requiring buyers to affirm that they are not dental offices in order to purchase products.

193. Per the Antitrust Action Complaint, Henry Schein, Patterson, and Benco sought to conceal the Antitrust Conspiracy; in one instance, a Patterson employee emailing a Benco

employee on July 21, 2014 regarding a coordinated boycott of the Arizona Dental Association's 2015 trade show, stated, in relevant part: "Please discuss [this] live and no further emails." David Misiak ("Misiak"), Patterson's Vice President of Sales gave a similar instruction to Patterson employees on the same day: "Please discuss live and no emails on this topic," and, on September 30, 2013, shortly before a boycott of the Texas Dental Association's 2014 trade show, Defendant T. Sullivan, requested that Paterson's CEO, Scott P. Anderson call him directly.

194.    Perceiving GPOs as a threat to their healthy margins, Henry Schein, Patterson, and Benco also conspired to prevent GPOs from successfully competing in the dental supply and equipment distribution market.

195.    In February 2013, after Benco suspected that Patterson was offering discounts to a New Mexico GPO, Benco's managing director Chuck Cohen ("Cohen") sent an email to Patterson's President, Paul Guggenheim ("Guggenheim"), stating: "Just wanted to let you know about some noise I've picked up from New Mexico. FYI: Our policy at Benco is that we do not recognize, work with, or offer discounts to buying groups . . . and our team understands that policy." FTC Decision at 193-194. Guggenheim forwarded the Benco email to Misiak and Tim Rogan ("Rogan"), Patterson's Vice President for Marketing. Guggenheim then replied to the Benco executive, stating: "Thanks for the heads up. I'll investigate the situation. We feel the same way about these*." Id.* at 195.

196.    According to the FTC Complaint, as a result of the agreement, Patterson executives instructed their sales persons not to deal with GPOs.

197.    In a February 27, 2013 e-mail, Misiak instructed his sales team to avoid selling to Atlantic Dental Care, a customer that Patterson, Henry Schein, and Benco believed to be a GPO, stating that both Benco and Henry Schein were also rejecting such buyers: "Confidential and not

for discussion..our [sic] 2 largest competitors stay out of these as well. If you hear differently and have specific proof please send that to me*."* FTC Decision at 198. In another February 27, 2013 email to Guggenheim, Misiak stated: "I'm concerned that Schein and Benco sneak into these co-op bids and deny it." *Id*. at 197.

198.    On March 24, 2013, Defendant T. Sullivan discussed Atlantic Dental Care over the phone with Cohen for over ten minutes, during which Cohen informed Defendant T. Sullivan that Benco would not be bidding for Atlantic Dental care's business. Subsequently, Cohen sent a text message to Defendant T. Sullivan, stating, "Tim: Did some additional research on the Atlantic Care deal, seems like they have actually merged ownership of all the practices. So it's not a buying group, it's a big group. We're going to bid. Thanks." *Id.* at 189. Per the FTC Complaint, ultimately, Benco and Henry Schein both ended up bidding on Atlantic Dental Care's business, which Benco won in May 2013.

199.    On August 2, 2013, a new Patterson executive asked Rogan and Misiak: "Is it worth it to explore GPO??????? . . . I used to get 1 [request] per month . . . ," to which Rogan responded: "We don't need GPO's in the dental business. Schein, Benco, and Patterson have always said no. I believe it is our duty to uphold this and protect this great industry." FTC Decision at 202.

200.    In September 2013, after learning that Burkhart was doing business with a GPO, Patrick Ryan ("Ryan"), a Benco sales director sent an email to Cohen, stating, "maybe what you should do is make sure you tell Tim [Sullivan] and Paul [Guggenheim] to hold their positions as we are." *Id.* at 122.

201.    On October 1, 2013, Ryan reached out to Randy Foley, Henry Schein's Vice-President of Sales, and informed him that Benco was committed not to do business with GPOs, and that Benco would not do business with Smile Source, a GPO that Henry Schein and Benco

had previously refused to do business with in 2012. Subsequently, Ryan and Cohen discussed Smile Source in internal emails, with Ryan stating, "Randy [Foley] at Schein and I talked specifically about them. Buh-bye." *Id.* at 184. Per the FTC Complaint, ultimately, neither Henry Schein nor Benco ended up bidding on Smile Source's business during 2013.

202.   During 2014, Henry Schein had an "exclusive relationship with Colgate," a dental products manufacturer, whereby Henry Schein did not sell products manufactured by Colgate's competitors. FTC Decision at 153.

203.   Additionally, According to the FTC Complaint, Henry Schein, Patterson, and Benco engaged in a planned and coordinated strategy with respect to GPOs formed by state dental associations, specifically the Texas Dental Association ("TDA") and the Arizona Dental Association ("AZDA").

204.   Henry Schein, Patterson and Benco used their power over state dental associations to exclude would-be competitors since 2013. In October 2013, when price-competing competitor SourceOne teamed up with the TDA to provide price-competing distribution systems (the "TDA GPO"), Henry Schein, Patterson, and Benco threatened to boycott manufacturers working with SourceOne, leading SourceOne to lose access to 75% of its top selling products. According to the Antitrust Action complaint, several manufacturers indicated to SourceOne that their decision to stop selling to SourceOne was a result of threats from Henry Schein, Patterson, and Benco.

205.   According to the Antitrust Action Complaint, Henry Schein, Patterson, and Benco boycotted the trade shows of state dental associations that were doing business with SourceOne, and strong-armed manufacturers into not attending the trade shows of the TDA and the AZDA in 2014.

206.   Henry Schein, Patterson, and Benco, according to the Antitrust Action Complaint, boycotted dentists who purchased supplies from SourceOne by withholding service and repair for installed equipment, or by performing such repairs at a higher cost and with significant delays.

207.   In October 2013, Benco's Texas Regional manager informed a Henry Schein Texas Regional manager that Benco was considering boycotting the TDA Trade show, and stated, "Chuck Cohen will be reaching out to . . . Tim Sullivan to see if [Schein] … would do the same thing…" FTC Decision at 229.

208.   According to the FTC Complaint, on December 11, 2013, Benco's Texas regional manager stated, in regard to the TDA GPO: "I have been talking to the directors of Schein and Patterson. We are going to be taking a stand together against them." That same month, a Henry Schein regional manager in Texas visited a Patterson branch manager who relayed Patterson would not be attending the TDA trade show. Henry Schein's zone manager conveyed this information to his boss, stating: "FYI Patterson pulled out of [the TDA] Convention. I firmly believe they made the move expecting us to follow suit."

209.   On January 6, 2014, Misiak spoke on the phone for 14 minutes with David Steck ("Steck"), Henry Schein's Vice President of Sales, who sent an email to Misiak on January 21, 2014, with the subject "Texas" that stated: "I'll be calling you to let you know about our decision on the matter we recently discussed in the next couple of days."  FTC Decision at 230.

210.   In the same email thread, Misiak expressed his frustration to Rogan, stating that Steck "already told me that they were out. Full blown!" Rogan: "That sucks. You should call him. 'Thought I could trust you' type of conversation." SourceOne Order at 4.

211.   A February 1, 2014 internal email from a dental distributor stated that "Patterson was encouraging Schein to support them in pulling out of meetings" for state dental associations

that supported SourceOne. The Antitrust Action Complaint also quotes a March 31, 2014 email

thread forwarded by David McCarley of McCarley Dental stated, in relevant part:

> some of the vendors say that they were told by both Patterson and Schein not to
> have anything to do with TDA Perks or they would shelve their products
> nationwide.
>
> <div align="center">* * *</div>
>
> Big Dental Suppliers are sending false info to Dentists [about SourceOne].
> Patterson reps have even called the TDA pretending to be Dentists complaining.
> We have traced the calls back to the Reps. . . . If this is true I am sure the Board
> will cut ties immediately with SourceOne.

212.    On April 16, 2014, Cohen at Benco sent an email to Defendant T. Sullivan and

Guggenheim that forwarded an article about the TDA GPO, stating: "Thought you'd be interested

in this 'essay' from our friends at the TDA." FTC Decision at 230.

213.    According to the Antitrust Action Complaint, an April 21, 2014 SourceOne email

stated the following:

> TDA has received a significant number of cancelations for their annual session
> (April 30 – May 3) from a variety of manufacturers previously confirmed to exhibit.
> Many of them cited pressure from both Henry Schein and Patterson as the reason
> for the last minute cancelation. Many of them informed the TDA that they were
> specifically threatened by both companies that if they did not cancel their
> attendance at the conference, various unpleasant things would happen to them.

214.    According to the FTC Complaint, ultimately, neither Henry Schein, Patterson, nor

Benco attended the 2014 TDA trade show.

215.    According to the FTC Complaint, Henry Schein, Benco, and Patterson also

discussed withdrawing from the AZDA annual trade show in response to AZDA's creation of a

buying group in July 2014, with Benco's Arizona regional manager having sent an email to a

Patterson branch manager in Arizona on July 21, 2014 that stated: "I know that Patterson, Schein

and Benco boycotted the Texas Dental Association meeting this year after the TDA did the same

thing and wanted to see if we could create the same message here in AZ."

216.    According to the Antitrust Action Complaint, July 2014 communications between a Patterson employee and a Benco employee revealed that Patterson and Benco discussed pulling their sponsorships of the AZDA trade show the following year, and that Henry Schein, Patterson, and Benco expressed to each other that none of the three would attend this AZDA meeting.

217.    Moreover, according to the Antitrust Action Complaint, an August 2014 email from a Benco employee noted disappointment with the AZDA's decision to directly compete with Benco and its fellow distributors, in addition to noting that leadership at Henry Schein, Benco, and Patterson indicated that they would evaluate the companies' future participation in AZDA events if the AZDA maintained its affiliation with SourceOne.

218.    According to the FTC Complaint, following these, and likely other, inter-firm communications in the summer of 2014, Henry Schein, Benco, and Patterson each withdrew from the AZDA trade show.

219.    There was no pro-competitive purpose for the boycott of the TDA and AZDA trade shows, and, according to the Antitrust Action Complaint, Henry Schein, Patterson, and Benco forfeited substantial deposits associated with attendance.

220.    The court in SourceOne found that failing to attend the TDA and AZDA trade shows was "not clearly in [the distributors] own individual economic self-interest." SourceOne Order at 15. Indeed, Patterson branch manager Bob Ingersoll and salesperson Christopher Cobb testified at their depositions that if Henry Schein and Benco attended, Patterson's failure to attend would be to the Company's economic disadvantage. *Id.* at 17.

221.    Moreover, the court in SourceOne confirmed certain of the facts surrounding the Company's boycott of SourceOne at the TDA and AZDA trade shows, stating the following:

> Based on the evidence presented, a jury could reasonably find that at some point between October 2013 and January 2014, defendants agreed with each other or with

> Schein to exclude SourceOne from the market, including by agreeing to boycott the conventions hosted by the Texas Dental Association and the Arizona Dental Association if those associations did not discontinue their relationship with SourceOne, and by pressuring individual manufacturers and at least one prominent dentist to also discontinue their relationship with SourceOne in furtherance of this conspiracy.

*Id.* at 11-12.

222.   The scheme to conspire to boycott GPOs continued into 2014 and 2015, with executives from each of the three companies confirming the existence of an agreement in restraint of trade. For example, in May 2015, according to the FTC Complaint, Benco rejected a GPO, and a Benco executive commented in an internal email: "The best part about calling these [buying groups] is I already KNOW that Patterson and Schein have said NO." FTC Decision at 122.

223.   In June 2015, a Benco executive informed a Benco sales representative: "We don't allow [volume discount] pricing unless there is common ownership. Neither Schein nor Patterson do either." *Id.* at 123.

224.   Furthermore, Lettieri, the former Regional General Manager cited in the 2018 Securities Class Action, corroborated certain facts underlying the Antitrust Conspiracy discussed herein.

225.   For instance, Lettieri stated that Henry Schein's Vice President of Sales, Jake Meadows ("Meadows"), instructed Lettieri not to attend the meeting of a state dental association because Patterson had pulled out of the meeting.

226.   Lettieri also noted that Meadows met with Benco personnel frequently, including at meetings in Chicago in 2010 and 2013, as well as meetings in New York in 2014 and 2015.

**Lawsuits Filed in Connection with the Antitrust Conspiracy**

227.   The AW Action was filed by AW on August 31, 2012 against Henry Schein and a number of medical equipment manufacturers, alleging violations of Section 1 of the Sherman Act

(15 U.S.C. § 1), and the Texas Free Enterprise and Antitrust Act, (TEX. BUS. & COMM. CODE, § 15.01). The Texas Free Enterprise and Antitrust Act provides that "[t]he provisions of this Act shall be construed to accomplish [its] purpose and shall be construed in harmony with federal judicial interpretations of comparable federal antitrust statutes to the extent consistent with [its] purpose." TEX. BUS. & COMM. CODE, § 15.04.

228.    The Texas Free Enterprise and Antitrust Act "is modeled on the Sherman and Clayton Acts." The Clayton Act prohibits, among other things, "price discrimination, tying arrangements, exclusive dealings, certain mergers and acquisitions, and interlocking directorates. The Texas Antitrust Act likewise prohibits such conduct." Paul Yetter, *Texas Business Litigation* at 76-77 (Sofia Adrogué and Caroline Baker eds., 2015 ed.)

229.    Section 2 of the Clayton Act states the following:

***It shall be unlawful for any person engaged in commerce, in the course of such commerce, to be a party to, or assist in, any transaction of sale, or contract to sell, which discriminates to his knowledge against competitors of the purchaser***, in that, any discount, rebate, allowance, or advertising service charge is granted to the purchaser over and above any discount, rebate, allowance, or advertising service charge available at the time of such transaction to said competitors in respect of a sale of goods of like grade, quality, and quantity; to sell, or contract to sell, goods in any part of the United States at prices lower than those exacted by said person elsewhere in the United States for the purpose of destroying competition, or eliminating a competitor in such part of the United States; or, to sell, or contract to sell, goods at unreasonably low prices for the purpose of destroying competition or eliminating a competitor.

15 U.S.C. § 13(a).

(Emphasis added).

230.    Section 3 of the Clayton Act states the following:

***It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods***, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under

the jurisdiction of the United States, ***or fix a price charged therefor***, or discount from, or rebate upon, such price, ***on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller***, *where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.*

15 U.S.C. § 14. (Emphasis added).

231.    The FTC distinguishes the Clayton Act from the Sherman Act as follows:

***The Clayton Act addresses specific practices that the Sherman Act does not clearly prohibit***, such as mergers and interlocking directorates (that is, the same person making business decisions for competing companies). Section 7 of the Clayton Act prohibits mergers and acquisitions where the effect "may be substantially to lessen competition, or to tend to create a monopoly." As amended by the Robinson-Patman Act of 1936, ***the Clayton Act also bans certain discriminatory prices, services, and allowances in dealings between merchants***. The Clayton Act was amended again in 1976 by the Hart-Scott-Rodino Antitrust Improvements Act to require companies planning large mergers or acquisitions to notify the government of their plans in advance.[9]

(Emphasis added).

232.    In *Gottesman v. General Motors Corp.,* the U.S. District Court for the Southern District of New York stated the following, with respect to violations of the Clayton Act:

It seems too obvious to require discussion that facts on which a finding of a violation of the Clayton Act is based are insufficient to support a finding of a violation of the Sherman Act, since the Clayton Act was intended to catch potential Sherman Act violations in their incipiency.

Gottesman v. General Motors Corporation, 221 F.Supp. 488, 492 (S.D.N.Y.1963).

233.    In Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., the U.S. Court of Appeals for the Ninth Circuit stated that "a greater showing of anticompetitive effect is required to establish a Sherman Act violation than a section 3 Clayton Act violation in exclusive-dealing

---

[9] https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last visited November 12, 2019).

cases." Twin City Sportservice, Inc. v. Charles O. Finley & Co., Inc., 676 F.2d 1291, 1304, n. 9 (9th Cir.1982).

234.    The AW Action revealed that beginning in 2008, Henry Schein employees, including Lowery, made threats to certain equipment manufacturers to the effect that Henry Schein would stop doing business with them if they continued to supply equipment to AW and Dynamic Dental Solutions ("Dynamic"), a company AW had partnered with. As a result, manufacturers such as Pelton & Crane, as well as Danaher Corporation, who had worked with AW for years, ceased doing business with AW and Dynamic.

235.    The SourceOne Action was filed by SourceOne on September 21, 2015 against Henry Schein, Benco, and Patterson, alleging violations of Section 1 of the Sherman Act (15 U.S.C. § 1), the Arizona Uniform State Antitrust Act (ARIZ. REV. STAT ANN. §§ 44-1401 *et seq*), and the Donnelly Act (N.Y. GEN. BUS. LAW §§ 340-347).

236.    With respect to the Arizona Uniform State Antitrust Act and the Donnelly Act, the court in SourceOne found that "[b]oth statutes are interpreted in accordance with federal antitrust laws. None of the parties identify any reason to analyze the state claims differently than the federal claims." SourceOne Order at 26.

237.    Henry Schein ultimately settled the SourceOne Action for approximately $5.3 million.

238.    On November 6, 2015, Dentsply International Inc. ("Dentsply") filed an action against Dental Brands for Less LLC ("Dental Brands"), an online dental supply store, alleging violations of unfair competition and trademark laws (the "Dentsply Action.")[10] The Dentsply Action provides further insight into the effects of the Antitrust Conspiracy in the dental products

---

[10] *Dentsply International, Inc. v. Dental Brands for Less LLC*, No. 1:15-cv-08775-LGS-GWG (S.D.N.Y.), filed November 6, 2015.

market during this period. The Dentsply Action revealed that as a result of the Antitrust Conspiracy, dental suppliers were able to sell their products at inflated prices and high gross margins to companies including Henry Schein, Patterson, and Benco. Moreover, Henry Schein, Patterson, and Benco accounted for approximately 85% of Dentsply's business in the U.S., and as such, Dentsply was compelled to refrain from doing business with smaller suppliers such as Dental Brands, for fear of losing its business with Henry Schein, Patterson, and Benco, thus forcing such smaller suppliers out of the market. Henry Schein appeared as an interested party in the Dentsply Action on December 30, 2016.

239.    On February 26, 2016, the Antitrust Action was filed by a class of purchasers of dental products against Henry Schein, Benco, and Patterson, alleging violations of Section 1 of the Sherman Act (15 U.S.C. § 1). Henry Schein ultimately settled the Antitrust Action for approximately $38.5 million.

240.    On August 3, 2017, the Texas Attorney General filed the Texas AG Action against Henry Schein, alleging violations of the Texas Free Enterprise and Antitrust Act, (TEX. BUS. & COMM. CODE, § 15.01) in connection with Henry Schein's boycott of the 2014 TDA trade show. Henry Schein settled the Texas AG Action that same day, on August 3, 2017, by stipulating to an injunction prohibiting any anticompetitive activity by the Company in Texas.

241.    On August 17, 2017, the IQ Dental Action was filed by IQ Dental, a dental products distributor whose business had been affected by the SourceOne boycott, against Henry Schein, Benco, and Patterson, alleging violations of Section 1 of the Sherman Act (15 U.S.C. § 1). The IQ Dental Action was ultimately dismissed on December 27, 2016 on standing grounds.

**Covetrus and the Spin-off Merger**

242.     In April 2018, Henry Schein began the process of merging Henry Schein Animal Health with VFC, a veterinary technology company, after which Henry Schein would divest and separate itself from the resultant entity, Covetrus (collectively, the "Spin-off Merger").

243.     Henry Schein Animal Health was the Company's now-discontinued business segment that distributed pharmaceuticals, supplies, equipment, and veterinary software to veterinary clinics and other animal healthcare providers.

244.     Covetrus is a global provider of veterinary and animal health products, which include pharmaceuticals as well as laboratory and surgical products. Covetrus also provides inventory management and supply chain services to its customers, through which Covetrus delivers its products to hospitals, laboratories, veterinary clinics, and other animal healthcare providers.

245.     During April 2018, in order to facilitate the Spin-off Merger, Henry Schein incorporated HS Spinco, the entity that would become Covetrus, in Delaware.

246.     On December 26, 2018, the Individual Defendants caused Henry Schein to cause HS Spinco to file a Registration Statement on Form S-4 with the SEC, so that shares of HS Spinco stock could be distributed to Henry Schein and VFC shareholders in connection with the Spin-off Merger. Subsequently, HS Spinco was renamed Covetrus.

247.     On February 7, 2019, Henry Schein distributed 60 million shares of Covetrus stock to Henry Schein shareholders, and 40 million shares of Covetrus stock to VFC shareholders.

248.     In connection with the Spin-off Merger, Covetrus paid $755 million to fund a cash dividend to Henry Schein, and it paid $365 million to settle intercompany debt between Henry Schein and Henry Schein Animal Health.

249.    Also in connection with the Spin-Off Merger, Henry Schein entered into certain TSAs with Covetrus. Under the terms of the TSAs, Covetrus would pay Henry Schein to handle some of Covetrus's administrative services, until such time as Covetrus had fully established its own organizational infrastructure able to effectively handle those services.

250.    On February 8, 2019, Covetrus common stock began trading on NASDAQ, marking the beginning of the Second Relevant Period.

**The Individual Defendants' Duty to Disclose**

251.    SEC Regulation S-K imposes certain affirmative disclosure requirements on public companies, such as Henry Schein, with respect to their finances and operations. Specifically, Item 303 of Regulation S-K requires that all Form 10-Qs and 10-Ks filed with the SEC include a "Management's discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") section. Item 303(a)(3) provides that the MD&A section must:

> Describe any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported income from continuing operations and, in each case, indicate the extent to which income was so affected. In addition, describe any other significant components of revenues or expenses that, in the registrant's judgment, should be described in order to understand the registrant's results of operations.

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations. If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.

252.    As such, the Individual Defendants had a duty under Item 303 of Regulation S-K to disclose the Antitrust Conspiracy, because it constituted (i) unusual transactions or significant economic changes materially affecting the Company's reporting income, and (ii) known trends or

uncertainties that have had or should be reasonably expected to have a material impact on the Company's revenue or income.

### False and Misleading Statements During the First Relevant Period

*May 7, 2013 Form 10-Q*

253.     On May 7, 2013, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2013 with the SEC (the "May 2013 10-Q"). The May 2013 10-Q was signed by Defendant Paladino, and contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bergman and Paladino attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

254.     With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the May 2013 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> \* \* \*
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

255.     With respect to the drivers affecting the Company's profits, the May 2013 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

256.    The May 2013 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### June 5, 2013 Jefferies Global Healthcare Conference

257.    On June 5, 2013, Defendants Bergman and Paladino attended the Jefferies Global Healthcare Conference. At the conference, Defendant Bergman gave a presentation on the Company's business, during which he stated the following:

Our prices are competitive. They're not the lowest in the marketplace, but what we do is we supplement our branded offering with our private brand offering. . . . However, if price becomes an issue, we certainly can compete in a way that no one else can.

### August 6, 2013 Form 10-Q

258.    On August 6, 2013, the Company filed its quarterly report on Form 10-Q for the second fiscal quarter of 2013 with the SEC (the "August 2013 10-Q"). The August 2013 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the August 2013 10-Q.

259.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the August 2013 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

260.    With respect to the drivers affecting the Company's profits, the August 2013 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

261.    The August 2013 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### November 5, 2013 Form 10-Q

262.    On November 5, 2013, the Company filed its quarterly report on Form 10-Q for the third fiscal quarter of 2013 with the SEC (the "November 2013 10-Q"). The November 2013 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the November 2013 10-Q.

263.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the November 2013 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

\* \* \*

70

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

264.    With respect to the drivers affecting the Company's profits, the November 2013 10-Q stated:

 Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

265.    The November 2013 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***February 11, 2014 Form 10-K***

266.    On February 11, 2014, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2013 with the SEC (the "2013 10-K"). The 2013 10-K was signed by Defendants Bergman, Paladino, Breslawski, Benjamin, Mlotek, Alperin, Brons, Kabat, Laskawy, Mashima, Matthews, Raphael, Sheares, and L. Sullivan, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the 2014 10-K.

267.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the 2013 10-K stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong

commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

268.    With respect to the drivers affecting the Company's profits, the 2013 10-K stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

269.    With respect to competition and pricing in the North American healthcare market,

the 2013 10-K stated the following:

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the sale of our dental products, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company. In addition, we compete against a number of other distributors that operate on a national, regional and local level. In the animal health market, our primary competitors are MWI Veterinary Supply, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. Our primary competitors in the sale of medical products are McKesson Corporation and Cardinal Health, Inc., which are national distributors. We also compete against a number of regional and local animal health and medical distributors, as well as a number of manufacturers that

sell directly to veterinarians and physicians. With regard to our dental practice management software, we compete against numerous companies, including Carestream Health, Inc. and the Patterson Dental division of Patterson Companies, Inc. In the animal health practice management market, our primary competitors are IDEXX Laboratories, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. The medical practice management and electronic medical records market is very fragmented and we compete with numerous companies such as the NextGen division of Quality Systems, Inc., eClinicalWorks, Allscripts Healthcare Solutions, Inc. and athenahealth, Inc.

270.    With respect to the risks facing the Company, the 2013 10-K listed the following risk factor: "The health care products industry is highly competitive and we may not be able to compete successfully."

271.    The 2013 10-K also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### *May 6, 2014 Form 10-Q*

272.    On May 6, 2014, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2014 with the SEC (the "May 2014 10-Q"). The May 2014 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the May 2014 10-Q.

273.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the May 2014 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> \* \* \*
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices,

tend to favor distributors capable of providing specialized management information support.

274.   With respect to the drivers affecting the Company's profits, the May 2014 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

275.   The May 2014 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### *August 4, 2014 Form 10-Q*

276.   On August 4, 2014, the Company filed its quarterly report on Form 10-Q for the second fiscal quarter of 2014 with the SEC (the "August 2014 10-Q"). The August 2014 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the August 2014 10-Q.

277.   With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the August 2014 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices,

tend to favor distributors capable of providing specialized management information support.

278.    With respect to the drivers affecting the Company's profits, the August 2014 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

279.    The August 2014 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### August 4, 2014 Earnings Call

280.    Also on August 4, 2014, Defendants Bergman and Paladino held a conference call to discuss the Company's earnings for the second fiscal quarter of 2014. During the call, Defendant Bergman stated the following:

> Any time you have competition, it is better. I am a big fan of the free market and this restriction business in the end doesn't pay off. I think Henry Schein has a long tradition -- there are examples where it works better because you may need more resources in one way or another to advance the product, but I think Henry Schein's history as an outstanding value-added distributor has shown that we have always been able to find the right balance of products.

### November 6, 2014 Form 10-Q

281.    On November 6, 2014, the Company filed its quarterly report on Form 10-Q for the third fiscal quarter of 2014 with the SEC (the "November 2014 10-Q"). The November 2014 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the November 2014 10-Q.

282.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the November 2014 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

> *  *  *

> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

283.    With respect to the drivers affecting the Company's profits, the November 2014 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

284.    The November 2014 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### *February 11, 2015 Form 10-K*

285.    On February 11, 2015, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2014 with the SEC (the "2014 10-K"). The 2014 10-K was signed by Defendants Bergman, Paladino, Breslawski, Benjamin, Mlotek, Alperin, Bacow, Brons, Kabat,

Laskawy, Matthews, Raphael, Rekow, Sheares, and L. Sullivan, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the 2014 10-K.

286.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the 2014 10-K stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> * * *
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

287.    With respect to the drivers affecting the Company's profits, the 2014 10-K stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

288.    With respect to competition and pricing in the North American healthcare market, the 2014 10-K stated the following:

> The distribution and manufacture of health care supplies and equipment is highly competitive.  Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products.  Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company. In addition, we compete against a number of other distributors that operate on a national, regional and local level. In the animal health market, our primary competitors are MWI Veterinary Supply, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. Our primary competitor in the medical market is McKesson Corporation, which is a national distributor. We also compete against a number of regional and local animal health and medical distributors, as well as a number of manufacturers that sell directly to veterinarians and physicians. With regard to our dental practice management software, we compete against numerous companies, including Carestream Health, Inc. and the Patterson Dental division of Patterson Companies, Inc. In the animal health practice management market, our primary competitors are IDEXX Laboratories, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. The medical practice management and electronic medical records market is very fragmented and we compete with numerous companies such as the NextGen division of Quality Systems, Inc., eClinicalWorks and Allscripts Healthcare Solutions, Inc.

289.    With respect to the risks facing the Company, the 2014 10-K listed the following risk factor: "The health care products industry is highly competitive and we may not be able to compete successfully."

290.    The 2014 10-K also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***May 4, 2015 Form 10-Q***

291.    On May 4, 2015, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2015 with the SEC (the "May 2015 10-Q"). The May 2015 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the May 2015 10-Q.

292.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the May 2015 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

293.    With respect to the drivers affecting the Company's profits, the May 2015 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

294.    The May 2015 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***July 29, 2015 Form 10-Q***

295.    On July 29, 2015, the Company filed its quarterly report on Form 10-Q for the second fiscal quarter of 2015 with the SEC (the "July 2015 10-Q"). The July 2015 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the July 2015 10-Q.

296.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the July 2015 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

\* \* \*

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

297.    With respect to the drivers affecting the Company's profits, the July 2015 10-Q stated:

 Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

298.    The July 2015 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***November 4, 2015 Form 10-Q***

299.    On November 4, 2015, the Company filed its quarterly report on Form 10-Q for the third fiscal quarter of 2015 with the SEC (the "November 2015 10-Q"). The November 2015 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the November 2015 10-Q.

300.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the November 2015 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

301.    With respect to the drivers affecting the Company's profits, the November 2015 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

302.    The November 2015 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***February 10, 2016 Form 10-K***

303.    On February 10, 2016, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2015 with the SEC (the "2015 10-K"). The 2015 10-K was signed by Defendants Bergman, Paladino, Breslawski, Benjamin, Mlotek, Alperin, Bacow, Brons, Kabat, Laskawy, Matthews, Raphael, Rekow, Sheares, and L. Sullivan, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the 2015 10-K.

304. With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the 2015 10-K stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> * * *
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

305. With respect to the drivers affecting the Company's profits, the 2015 10-K stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

306. With respect to competition and pricing in the North American healthcare market, the 2015 10-K stated the following:

> The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.
>
> In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company. In

addition, we compete against a number of other distributors that operate on a national, regional and local level. In the animal health market, our primary competitors are the MWI Animal Health division of AmerisourceBergen and the Patterson Veterinary division of Patterson Companies, Inc. Our primary competitors in the medical market are McKesson Corporation and Medline Industries, Inc., which are national distributors. We also compete against a number of regional and local animal health and medical distributors, as well as a number of manufacturers that sell directly to veterinarians and physicians. With regard to our dental practice management software, we compete against numerous companies, including Carestream Health, Inc. and the Patterson Dental division of Patterson Companies, Inc. In the animal health practice management market, our primary competitors are IDEXX Laboratories, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. The medical practice management and electronic medical records market is very fragmented and we compete with numerous companies such as the NextGen division of Quality Systems, Inc., eClinicalWorks and Allscripts Healthcare Solutions, Inc.

307.     With respect to the risks facing the Company, the 2015 10-K listed the following risk factor: "The health care products industry is highly competitive and we may not be able to compete successfully."

308.     The 2015 10-K also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### *May 3, 2016 Form 10-Q*

309.     On May 3, 2016, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2016 with the SEC (the "May 2016 10-Q"). The May 2016 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the May 2016 10-Q.

310.     With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the May 2016 10-Q stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

311.    With respect to the drivers affecting the Company's profits, the May 2016 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

312.    The May 2016 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### August 4, 2016 Form 10-Q

313.    On August 4, 2016, the Company filed its quarterly report on Form 10-Q for the second fiscal quarter of 2016 with the SEC (the "August 2016 10-Q"). The August 2016 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the August 2016 10-Q.

314.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the August 2016 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

315.     With respect to the drivers affecting the Company's profits, the August 2016 10-Q stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

316.     The August 2016 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***August 4, 2016 Earnings Call***

317.     Also on August 4, 2016, Defendants Bergman and Paladino held a conference call to discuss the Company's earnings for the second fiscal quarter of 2016. During the call, a Goldman Sachs analyst asked Defendant Bergman the following question about competition in the dental market:

I hate to go back to this, but just on the North American dental market, I wanted to hone in a little bit on the merchandise side. It obviously must've really fallen off in June, based on your commentary.

I'm curious. Is there anything you could elaborate on or share with us relative to the competitive environment? Did you see any changes in behavior from your traditional competitors and the way that they are approaching their go-to-market strategy? Did you see any increased pressure from alternative distribution channels, like online pure-play competitors? Just anything that might help us get our heads around what seemingly was a pretty consistent growth until May, and then

obviously what -- based on the numbers you have shared seems like a fairly dramatic pullback in June, would be helpful.

318.    In response, Defendant Bergman stated, "I don't think there is any major change in dynamics on the competitive side. It is a competitive market, to be sure. There is no shortage of competitors. Everybody is fighting for that last dollar, so it is a competitive market."

***November 2, 2016 Form 10-Q***

319.    On November 2, 2016, the Company filed its quarterly report on Form 10-Q for the third fiscal quarter of 2016 with the SEC (the "November 2016 10-Q"). The November 2016 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the November 2016 10-Q.

320.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the November 2016 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> * * *
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

321.    With respect to the drivers affecting the Company's profits, the November 2016 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit

margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

322.    The November 2016 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***November 2, 2016 Earnings Call***

323.    Also on November 2, 2016, Defendants Bergman and Paladino held a conference call to discuss the Company's earnings for the third fiscal quarter of 2016. During the call, an Evercore ISI analyst asked Defendant Bergman if "in terms of the competitive environment you're seeing in dental in terms of large group or smaller spaces, do you have any additional comments on that area, any changes you've been seeing?"

324.    Defendant Bergman responded as follows:

Well the dental market has always been a very competitive market. We have been competing strongly with our major competitors and the smaller competitors for decades. I'm not sure the competition has increased substantially. At the end of the day, we believe we have a very strong proposition to offer to our large customers, our mid size customers and our smaller customers. The proposition we offer is based on a value, a margin generation value that enables us to fund the value-added services, which we believe are unique in the market.

325.    Also during the call, a UBS analyst asked Defendant Bergman the following question about competition and pricing:

I wanted ask a different type of competition question. I know this has been the theme but it seems like the theme across healthcare. I know you guys have been very much focusing on the value-added services you provide, the strong partnerships. Have you seen a trend of people working or are you trying to use price specifically? It seems like it's coming up in other different healthcare sub sectors whether it's in the dental market or even animal health and medical where people are trying to use price specifically as a weapon, trying to come in and take share.

326.    Defendant Bergman responded as follows:

Well of course prices has always played a role, a key role. You've got to be competitive. Price has been an issue in our markets for the 36 years that I've been in the business. So, yes, price is important. But you have to balance price with value-added services. It costs money to develop value-added services. . . . [T]he combination of investment in the value-added services and price is what drives competition and the bottom line. We obviously have to sharpen that as we have done every single year for decades. We have to sharpen, at the end of the day, the price we charge for the value-added service and the products. Competition has always been there. So I'm not sure if there's anything new in the market other than we have to just continue with what we've done for decades, which is to provide a better proposition to our customers.

***February 21, 2017 Form 10-K***

327.    On February 21, 2017, the Company filed its annual report on Form 10-K for the fiscal year ended December 31, 2016 with the SEC (the "2016 10-K"). The 2016 10-K was signed by Defendants Bergman, Paladino, Breslawski, Benjamin, Mlotek, Alperin, Bacow, Brons, Herring, Kabat, Kuehn, Laskawy, Matthews, Raphael, Rekow, and Sheares, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the 2016 10-K.

328.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the 2016 10-K stated:

We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.

* * *

In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

329.    With respect to the drivers affecting the Company's profits, the 2016 10-K stated:

Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

330.    With respect to competition and pricing in the North American healthcare market, the 2016 10-K stated the following:

The distribution and manufacture of health care supplies and equipment is highly competitive. Many of the health care distribution products we sell are available to our customers from a number of suppliers. In addition, our competitors could obtain exclusive rights from manufacturers to market particular products. Manufacturers also could seek to sell directly to end-users, and thereby eliminate or reduce our role and that of other distributors.

In North America, we compete with other distributors, as well as several manufacturers, of dental, animal health and medical products, primarily on the basis of price, breadth of product line, customer service and value-added products and services. In the dental market, our primary competitors are the Patterson Dental division of Patterson Companies, Inc. and Benco Dental Supply Company. In addition, we compete against a number of other distributors that operate on a national, regional and local level. In the animal health market, our primary competitors are the MWI Animal Health division of AmerisourceBergen and the Patterson Veterinary division of Patterson Companies, Inc. Our primary competitors in the medical market are McKesson Corporation and Medline Industries, Inc., which are national distributors. We also compete against a number of regional and local animal health and medical distributors, as well as a number of manufacturers that sell directly to veterinarians and physicians. With regard to our dental practice management software, we compete against numerous companies, including Carestream Health, Inc. and the Patterson Dental division of Patterson Companies, Inc. In the animal health practice management market, our primary competitors are IDEXX Laboratories, Inc. and the Patterson Veterinary division of Patterson Companies, Inc. The medical practice management and electronic medical records market is very fragmented and we compete with numerous companies such as the NextGen division of Quality Systems, Inc., eClinicalWorks and Allscripts Healthcare Solutions, Inc.

331.    With respect to the risks facing the Company, the 2016 10-K listed the following risk factor: "The health care products industry is highly competitive and we may not be able to compete successfully."

332.    The 2016 10-K also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***February 21, 2017 Earnings Call***

333.    Also on February 21, 2017, Defendants Bergman and Paladino held a conference call to discuss the Company's earnings for the fourth fiscal quarter of 2016. During the call, a JP Morgan analyst asked Defendant Bergman, with respect to "the competitive landscape in dental, especially as it relates to large versus smaller customers," whether the Company had observed "any changes in the competitive dynamics in either of those segments recently."

334.    Defendant Bergman responded as follows:

You know, this is probably the most asked question from analysts, other than, how's the market doing. And I just want to reemphasize what we've been saying for years. The dental market is competitive. It's a market that is driven by a combination of price and service offered -- in other words, value. I don't think anything has changed. We have a good market share in the large practices. We have, we believe, the most outstanding offering, with tremendous experience in that area. And yes, every now and again, a competitor will go in with a price that's below ours, and we will not match those prices. Because we believe our offering is of higher value, and we cannot and will not dilute the value that is ascribed to our offering. So I would be understanding that Henry Schein is competitive in the space, highly competitive in the space, has always been competitive. There has always been competition. The competition hasn't increased at all. It's the same competition we've had for decades. . . . Our job is to provide value to our customers. I believe we continue to do a good job in that area. And there is no more competition today than there was 10 years ago. The competition wants our business and we want our competitions' business. It's a fiercely competitive market.

***April 10, 2017 Proxy Statement***

335.    On April 10, 2017, the Company filed the 2017 Proxy Statement. Defendants Bergman, Paladino, Alperin, Bacow, Benjamin, Breslawski, Brons, Herring, Kabat, Kuehn, Laskawy, Mlotek, Raphael, Rekow, and Sheares solicited the 2017 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[11]

---

[11] Plaintiff's allegations with respect to the misleading statements in the 2017 Proxy Statement are based solely on

336.    With respect to the Business Standards and the Code of Ethics, the 2017 Proxy Statement stated, "[i]n addition to our Worldwide Business Standards applicable to all employees, we have adopted a Code of Ethics for Senior Financial Officers that applies to our Chief Executive Officer, Chief Financial Officer, Controller (if any) and Vice President of Corporate Finance, or persons performing similar function."

337.    The 2017 Proxy Statement also called for shareholder approval of, among other things, an amendment to the Company's 162(m) Cash Bonus Plan (the "Cash Bonus Plan"), to extend the terms of the Cash Bonus Plan to 2021, and to reapprove the performance goals stated therein. The Cash Bonus Plan provided for annual incentive payments to key executive officers of the Company, in connection with certain performance goals.

338.    The 2017 Proxy Statement was false and misleading because, despite assertions to the contrary, the Business Standards and the Code of Ethics were not followed, as evidenced by the Company's participation in the Antitrust Conspiracy, and the numerous false and misleading statements alleged herein, the insider trading engaged in by 12 of the Individual Defendants, and the Individual Defendants' failures to report violations of the Business Standards and the Code of Ethics.

339.    The 2017 Proxy Statement also failed to disclose, *inter alia*, that: (1) as a result of the Antitrust Conspiracy, the dental products market was not competitive, but was in fact pervaded by price-fixing and other anticompetitive misconduct; (2) as an additional result of the Antitrust Conspiracy, the Company overstated the impact of cost containment and pricing strategies on its business; (3) as a further result of the Antitrust Conspiracy, the Company overstated the value of

---

negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

its products and services; (4) the Company participated in the Antitrust Conspiracy; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, Henry Schein's public statements were materially false and misleading during the First Relevant Period.

340.     As a result of the material misstatements and omissions contained in the 2017 Proxy Statement, Company shareholders approved the amendment to the Cash Bonus Plan.

### *May 9, 2017 Form 10-Q*

341.     On May 9, 2017, the Company filed its quarterly report on Form 10-Q for the first fiscal quarter of 2017 with the SEC (the "May 2017 10-Q"). The May 2017 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the May 2017 10-Q.

342.     With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the May 2017 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> * * *
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

343.     With respect to the drivers affecting the Company's profits, the May 2017 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than

other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

344.    The May 2017 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

### *May 16, 2017 Bank of America Merrill Lynch Healthcare Conference*

345.    On May 16, 2017, Defendants Bergman and Paladino attended the Bank of America Merrill Lynch Healthcare Conference. At the conference, Defendant Bergman gave a presentation on the Company's business, during which he stated the following:

Dentistry has always been highly competitive on the distribution side. We expect it to continue to be highly competitive. . . . [T]he goal is to continue to provide value-added services. We provide very good value-added services in that area, but there's a price below which we will not go. And it is important for us to price our value-added services at a level that we can provide good returns to our investors.

### *June 13, 2017 Goldman Sachs Global Healthcare Conference*

346.    On June 13, 2017, Defendant Paladino gave a presentation at the Goldman Sachs Global Healthcare Conference. In response to a Goldman Sachs analyst's question regarding the threat of online competition, Defendant Paladino stated the following:

It's a really good question because everything is going digital. Technology is in every aspect of everyone's lives today. It's an area, though, that we feel that if we keep doing what our strength has been, which is to have a moat around our business, and that moat is really we're very competitive in pricing. But even today, without some of these new entrants, we're not the lowest in the market on every single price, on every single product. But what we do is we have unbelievably good service levels and a really strong offering of value-added products and services. And what we found is the market really wants more than just the lowest price. They want that combination of very competitive pricing as well as all the other services. So as long as we keep doing that, I think that we won't have to worry about that pure online discount player. And they're already in the market. Don't worry about new people getting in. It already represents 10% to 15% of the market today, and it really hasn't been growing at much faster rate than the overall market. So again, I think people

are voting with their wallet or their checkbook by really saying we really want all of these other services as well as competitive pricing.

***August 8, 2017 Form 10-Q***

347.    On August 8, 2017, the Company filed its quarterly report on Form 10-Q for the second fiscal quarter of 2017 with the SEC (the "August 2017 10-Q"). The August 2017 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the August 2017 10-Q.

348.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the August 2017 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> * * *
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

349.    With respect to the drivers affecting the Company's profits, the August 2017 10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin. For example, sales of pharmaceutical products are generally at lower gross profit margins than other products. Conversely, sales of our private label products achieve gross profit margins that are higher than average. With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

350.    The August 2017 10-Q also stated, "Our distribution business is characterized by rapid technological developments and intense competition."

***August 8, 2017 Earnings Call***

351.    Also on August 8, 2017, Defendants Bergman and Paladino held a conference call to discuss the Company's earnings for the second fiscal quarter of 2017. During the call, Defendant Bergman stated the following:

> We remain comfortable that although this is a highly competitive market and every dollar of business that we get, we have to fight for, we believe that we are well positioned to gain market share in the digital technology space and in fact, overall in the dental space, whether it's in consumables for dentists or equipment for dentists.

***November 6, 2017 Form 10-Q***

352.    On November 6, 2017, the Company filed its quarterly report on Form 10-Q for the third fiscal quarter of 2017 with the SEC (the "November 2017 10-Q"). The November 2017 10-Q was signed by Defendant Paladino, and contained SOX certifications signed by Defendants Bergman and Paladino attesting to the accuracy of the November 2017 10-Q.

353.    With respect to GPOs, the Company's competitiveness, and the healthcare industry at large, the November 2017 10-Q stated:

> We have established strategically located distribution centers to enable us to better serve our customers and increase our operating efficiency. This infrastructure, together with broad product and service offerings at competitive prices, and a strong commitment to customer service, enables us to be a single source of supply for our customers' needs.
>
> \* \* \*
>
> In recent years, the health care industry has increasingly focused on cost containment. This trend has benefited distributors capable of providing a broad array of products and services at low prices. It also has accelerated the growth of HMOs, group practices, other managed care accounts and collective buying groups, which, in addition to their emphasis on obtaining products at competitive prices, tend to favor distributors capable of providing specialized management information support.

354.    With respect to the drivers affecting the Company's profits, the November 2017

10-Q stated:

> Changes in the mix of products sold as well as changes in our customer mix have been the most significant drivers affecting our gross profit margin.  For example, sales of pharmaceutical products are generally at lower gross profit margins than other products.  Conversely, sales of our private label products achieve gross profit margins that are higher than average.  With respect to customer mix, sales to our large-group customers are typically completed at lower gross margins due to the higher volumes sold as opposed to the gross margin on sales to office-based practitioners who normally purchase lower volumes at greater frequencies.

355.    The November 2017 10-Q also stated, "Our distribution business is characterized

by rapid technological developments and intense competition."

***November 6, 2017 Earnings Call***

356.    Also on November 6, 2017, Defendants Bergman and Paladino held a conference

call to discuss the Company's earnings for the third fiscal quarter of 2017. During the call,

Defendant Bergman stated the following:

> We believe that the Value-Added service part of [Schein's] offering continues to grow in importance and we're investing heavily in that area. So the digital platform is an ordering platform, sometimes offered by standalone companies that only offer consumable products and there's a part of the market that goes there. And if it becomes really a price issue, well, Henry Schein has the largest variety of private brand, control brand products in the industry. We have practically everything a practitioner may need at very good prices. And if it becomes a price situation, we can win on that only if that's the only issue. So there are a lot of challenges that we have to face in our business like every other business. But to me, this is not on the top of the list. . . . I think [digital] will remain a size of the market of somewhere between 10%, 15% that'll be price only. And in that market, Henry Schein will continue to compete and compete very well.

357.    The statements referenced above in ¶¶ 253–316, 318–322, 324, 326–332, 334, and

341–356 were materially false and misleading because they misrepresented and failed to disclose

material adverse facts pertaining to the Company's business, finances, and prospects, which were

known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual

Defendants willfully or recklessly made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) as a result of the Antitrust Conspiracy, the dental products market was not competitive, but was in fact pervaded by price-fixing and other anticompetitive misconduct; (2) as an additional result of the Antitrust Conspiracy, the Company overstated the impact of cost containment and pricing strategies on its business; (3) as a further result of the Antitrust Conspiracy, the Company overstated the value of its products and services; (4) the Company participated in the Antitrust Conspiracy; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, Henry Schein's public statements were materially false and misleading during the First Relevant Period.

### The Truth Pertaining to the Antitrust Conspiracy Begins to Emerge

358.    On August 8, 2017, the Company issued a press release containing the Company's financial results for the second quarter of 2017, which revealed slowed growth for the quarter. Specifically, the press release reported favorable earnings per share ("EPS") but disclosed that the Company's North American dental consumables growth had increased by only 0.8% compared to the second quarter of 2016. During a conference call held that day to discuss the Company's financial results, Defendant Bergman blamed the Company's slowed growth on factors including "movement towards lower-priced products," as well as an extra holiday during the quarter and the loss of one of Henry Schein's customers.

359.    Defendant Paladino largely echoed Defendant Bergman's sentiments during the conference, stating, "I don't think we think there's any market changes that are important to note. I think we believe that there's a little bit of ebbs and flows and calendar issues that are contributing to it. But we still feel like the market is pretty consistent."

360.    Analysts reacted negatively to these disclosures. For example, analysts from Northcoast Research noted that "[the Company's] 0.8% North America dental consumable internal growth [was] below our estimate for the quarter," and that "[w]e could … be seeing modest pricing pressure in dental consumable products which is compressing overall internal growth rates." Additionally, analysts from Jefferies Group observed that "[w]e expect the stock to trade lower on disappointing dental experience & lack of upside to [the Company's] '17 EPS outlook."

361.    On this news, the price of the Company's stock dropped from $91.89 per share at the close of trading on August 7, 2017, to $87.01 per share at the close of trading on August 8, 2017.

362.    On November 6, 2017, the Company issued a press release containing the Company's financial results for the third quarter of 2017, which again reported disappointing results for the quarter, including below-expected EPS. During a conference call held that day to discuss the Company's financial results, Defendant Bergman attempted to blame the disappointing financial results on challenges in the Company's European business, faster growth in lower-margin areas of the Company's business, and the renewal of certain important contracts at lower margins. Additionally, the Company's 10-Q filed the same day disclosed the IQ Dental Action and the AW Action filed against the Company.

363.    Analysts again reacted negatively to these disclosures, with Piper Jaffray reporting that "HSIC reported disappointing 3Q17 results driven by margin pressure and soft dental consumables growth," but "we believe dental consumables growth can rebound in 2018."

364.    On this news, the price of the Company's stock dropped again from $77.64 per share at the close of trading on November 3, 2017, to $70.04 per share at the close of trading on

November 6, 2017, on heavy volume. This drop represented a loss of $1.2 billion in the Company's market capitalization.

365.    Finally, on February 12, 2018, the Federal Trade Commission issued a press release revealing that it had filed an administrative complaint against Henry Schein, Benco and Patterson, after a long, undisclosed investigation of the companies for violations of Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 . The complaint alleged that starting from at least February 2013, the named entities had engaged in a conspiracy to fix the prices of dental supply products and refused to sell to GPOs, in violation of federal antitrust law. The press release stated the following, in relevant part:

> [T]he complaint contends that Benco, Henry Schein and Patterson unreasonably restrained price competition for dental products in the United States; distorted prices and undermined the ability of independent dentists to obtain lower prices and discounts for dental products; deprived independent dentists of the benefits of vigorous price and service competition among full-service, national dental distributors; unreasonably reduced output of dental products to dental buying groups; and eliminated or reduced the competitive bidding process for sales to these buying groups.

366.    In a report commenting on the filing of the FTC Action, Leerink analysts noted, "[w]e view this news as being very serious, and could result in longer-term margin headwinds and multiple compression for HSIC."

367.    On this news, the price of Henry Schein shares plummeted by over 6.6%, from $72.18 at the close of trading on February 12, 2018, to $67.39 per share at the close of trading on February 13, 2018, representing a loss of roughly $785 million in Henry Schein's market capitalization.

**False and Misleading Statements During the Second Relevant Period**

***December 26, 2018 Registration Statement***

368.    On December 26, 2018, the Individual Defendants caused the Company to cause HS Spinco to file a Registration Statement on Form S-4 (the "Registration Statement") with the SEC, pursuant to the Spin-off Merger. The Registration Statement was incorporated by reference in a Prospectus on Form 424B3 filed by Covetrus with the SEC on February 7, 2019, which completed the Spin-off Merger, and caused Covetrus shares to begin trading publicly on NASDAQ the following morning, on February 8, 2019. The Registration Statement was signed by, among others, Defendants Paladino and Mlotek.

369.    The Registration Statement stated that Covetrus's "key strengths" included "inventory management and supply chain services and technology that help improve practice efficiency and economics."

370.    The Registration Statement also discussed the "key benefits" of the Spin-off Merger, which included:

> the complementary fit of Vets First Choice and the Henry Schein Animal Health Business, and the strategic benefits of a global, technology-enabled animal health business with a comprehensive service and technology platform and supply chain infrastructure supporting the companion, equine and large animal veterinary markets.

371.    The Registration Statement further stated that Covetrus is "well suited to compete in this market," and that "[Covetrus's] global scale, comprehensive and integrated capabilities and expertise will allow [Covetrus] to win business and access additional revenue opportunities while addressing [Covetrus's] fragmented customer base's evolving needs."

### *March 3, 2019 Industry Conference*

372.    On March 3, 2019, after Covetrus shares had begun trading publicly on NASDAQ, Defendant Paladino attended an industry conference, during which he stated that the Company's

TSAs with Covetrus were "as long as…21 months," and that "some things will sunset earlier than that. Some things will sunset in 3 or 4 months and other things will sunset much longer than that."

373.    At the conference, Paladino also stated that "there's a lot of activity that the Henry Schein teams need to do to properly service Covetrus. And we want to make sure Covetrus is serviced well."

***March 13, 2019 Industry Conference***

374.    On March 13, 2019, Defendant Paladino attended another industry conference, during which he stated that "the merger of the two companies will create shareholder value and that there's over $100 million of EBITDA synergies that are expected by the end of year 3. So that's a pretty significant number and can't be achieved unless the two companies were brought together."

375.    With respect to Henry Schein's TSAs with Covetrus, Defendant Paladino stated the following:

> Henry Schein and Covetrus have something like 80-plus TSAs for 80 different services that Henry Schein will continue to provide Covetrus until they're able to provide those services on their own. So they run anywhere from a few months to maybe 21 months in duration from closing.

376.    Defendant Paladino further stated that the TSAs lasted "from a few months to 21 months" so that "both parties can be prepared for when the service agreements end," and so "Henry Schein can take that time to plan and reduce the stranded costs that it has, and that's our goal, at the time that the services end to virtually eliminate the stranded costs."

377.    The statements referenced above in ¶¶ 368–376 were materially false and misleading because they misrepresented and failed to disclose material adverse facts pertaining to Covetrus's business, finances, and prospects, which were known to the Individual Defendants or recklessly disregarded by them. Specifically, the Individual Defendants willfully or recklessly

made false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Covetrus would require millions of dollars in infrastructure investments relating to Covetrus's supply chain and inventory management services; (2) Covetrus was not fully apprised as to the additional infrastructure investments that Covetrus would require; (3) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (4) a competitive market, as well as the loss of a significant North American customer "weighed heavily" on Covetrus's growth prospects.

### The Truth Emerges as to Covetrus

378.    On August 13, 2019, Covetrus issued a press release reporting its financial results for the second quarter of 2019, which was Covetrus's first full fiscal quarter as a public company. The press release reported a loss for the quarter, and it revealed that Covetrus had reduced its EBITDA guidance to $200 million, down from $250 million. The press release also disclosed that the "loss of a large customer prior to the formation of Covetrus also impacted organic net sales growth by 3% in the second quarter."

379.    In explaining Covetrus's losses and reduced guidance, the CEO of Covetrus, Benjamin Shaw ("Shaw") stated that Covetrus had accelerated investments tied to Covetrus's "separation from Henry Schein and the build-out of infrastructure that supports completion of the carve out." Shaw further stated that "additional infrastructure expense and duplicative cost" related to the TSAs with Henry Schein had caused Covetrus to pay twice for some of the same services.

380.    Moreover, the CFO of Covetrus, Christine Komola ("Komola") revealed that the Company would be spending $40 million, up from $25 million, on its investments in 2019. Komola also disclosed that the Company would be spending $10 to $15 million in recurring operating expenses, which had not been previously contemplated by Covetrus.

381.    On this news, Covetrus's share price dropped from $23.19 per share at the close of trading on August 12, 2019, to $13.89 at the close of trading on August 13, 2019, due to the foregoing false and misleading statements and omissions of material fact during the Second Relevant Period that, among others, the Individual Defendants made and/or caused the Company to make. As a result of the false and misleading statements and omissions of material fact made during the Second Relevant Period, the Company was named as a defendant in the 2019 Securities Class Action and will incur legal costs and expenses in connection thereto.

### Repurchases During the First Relevant Period

382.    During the First Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.67 billion to repurchase approximately 850 million shares of its own common stock at artificially inflated prices.

383.    According to the May 2013 10-Q, the Company purchased 282,000 shares of its common stock during March 2013 for approximately $25.3 million, at an average price of $89.99 per share.

384.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during March 2013 was approximately $6.3 million.

385.    According to the August 2013 10-Q, the Company purchased 839,435 shares of its common stock during the second fiscal quarter of 2013 for approximately $78 million, at an average price of $93.19 per share.

386.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the second fiscal quarter of 2013 was approximately $21.4 million.

387.     According to the November 2013 10-Q, the Company purchased 729,700 shares of its common stock during the third fiscal quarter of 2013 for approximately $74.9 million, at an average price of $102.95 per share.

388.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the third fiscal quarter of 2013 was approximately $25.7 million.

389.     According to the 2013 10-K, the Company purchased 664,357 shares of its common stock during the fourth fiscal quarter of 2013 for approximately $73.7 million, at an average price of $111.14 per share.

390.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the fourth fiscal quarter of 2013 was approximately $29 million.

391.     According to the May 2014 10-Q, the Company purchased 647,315 shares of its common stock during the first fiscal quarter of 2014 for approximately $75.3 million, at an average price of $116.36 per share.

392.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the first fiscal quarter of 2014 was approximately $31.6 million.

393.    According to the August 2014 10-Q, the Company purchased 653,952 shares of its common stock during the second fiscal quarter of 2014 for approximately $76.1 million, at an average price of $116.53 per share.

394.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the second fiscal quarter of 2014 was approximately $32 million.

395.    According to the November 2014 10-Q, the Company purchased 632,512 shares of its common stock during the third fiscal quarter of 2014 for approximately $74.8 million, at an average price of $118.27 per share.

396.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the third fiscal quarter of 2014 was approximately $32.2 million.

397.    According to the 2014 10-K, the Company purchased 594,430 shares of its common stock during the fourth fiscal quarter of 2014 for approximately $73.7 million, at an average price of $126.08 per share.

398.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the fourth fiscal quarter of 2014 was approximately $33.6 million.

399.    According to the May 2015 10-Q, the Company purchased 542,029 shares of its common stock during the first fiscal quarter of 2015 for approximately $75.7 million, at an average price of $139.81 per share.

400.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the first fiscal quarter of 2015 was approximately $39.1 million.

401.    According to the July 2015 10-Q, the Company purchased 266,757 shares of its common stock during the second fiscal quarter of 2015 for approximately $37.5 million, at an average price of $140.58 per share.

402.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the second fiscal quarter of 2015 was approximately $19.5 million.

403.    According to the November 2015 10-Q, the Company purchased 261,295 shares of its common stock during the third fiscal quarter of 2015 for approximately $37.6 million, at an average price of $136.78 per share.

404.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the third fiscal quarter of 2015 was approximately $20 million.

405.    According to the 2015 10-K, the Company purchased 1,014,216 shares of its common stock during the fourth fiscal quarter of 2015 for approximately $148.9 million, at an average price of $149.98 per share.

406.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the fourth fiscal quarter of 2015 was approximately $80.6 million.

407.    According to the May 2016 10-Q, the Company purchased 664,398 shares of its common stock during the first fiscal quarter of 2016 for approximately $99.9 million, at an average price of $150.69 per share.

408.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the first fiscal quarter of 2016 was approximately $55.2 million.

409.    According to the August 2016 10-Q, the Company purchased 336,544 shares of its common stock during the second fiscal quarter of 2016 for approximately $57 million, at an average price of $169.41 per share.

410.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the second fiscal quarter of 2016 was approximately $34.3 million.

411.    According to the November 2016 10-Q, the Company purchased 1,179,498 shares of its common stock during the third fiscal quarter of 2016 for approximately $192.9 million, at an average price of $166.19 per share.

412.    As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the third fiscal quarter of 2016 was approximately $113.5 million.

413.    According to the 2016 10-K, the Company purchased 1,281,342 shares of its common stock during the fourth fiscal quarter of 2016 for approximately $200 million, at an average price of $155.19 per share.

414.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the fourth fiscal quarter of 2016 was approximately $113.6 million.

415.     According to the May 2017 10-Q, the Company purchased 308,037 shares of its common stock during the first fiscal quarter of 2017 for approximately $50 million, at an average price of $165.42 per share.

416.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the first fiscal quarter of 2017 was approximately $29.2 million.

417.     According to the August 2017 10-Q, the Company purchased 288,756 shares of its common stock during the second fiscal quarter of 2017 for approximately $49.9 million, at an average price of $172.63 per share.

418.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the second fiscal quarter of 2017 was approximately $30.5 million.

419.     According to the November 2017 10-Q, the Company purchased 1,431,646 shares of its common stock during the third fiscal quarter of 2017 for approximately $124.9 million, at an average price of $88.25 per share.

420.     As the Company's stock was actually only worth $67.39 per share, the price at closing on February 13, 2018, the amount the Company overpaid for repurchases of its own stock during the third fiscal quarter of 2017 was approximately $28.5 million.

421.     In total, the Company overpaid an aggregate amount of approximately $776 million for repurchases of its own stock during the First Relevant Period.

## DAMAGES TO HENRY SCHEIN

422.    As a direct and proximate result of the Individual Defendants' conduct, Henry Schein will lose and expend many millions of dollars.

423.    Such expenditures include, but are not limited to, legal fees and payments associated with the numerous lawsuits and other actions lodged against the Company as a result of the misconduct discussed herein including the Antitrust Action, SourceOne Action, IQ Dental Action, AW Action, and the FTC Action filed against the Company, the 2018 Securities Class Action filed against the Company and two of the Individual Defendants, the 2019 Securities Class Action filed against the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

424.    Such expenditures include, but are not limited to, the approximately $5.3 million the Company paid to resolve the SourceOne Action, and the approximately $38.5 million the Company paid to resolve the Antitrust Action.

425.    Such losses include the Company's overpayment by over $776 million for repurchases of its own stock during the First Relevant Period, during which the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

426.    Additionally, these losses include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

427.    As a direct and proximate result of the Individual Defendants' conduct, Henry Schein has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

428.    Plaintiff brings this action derivatively and for the benefit of Henry Schein to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Henry Schein, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b), and 20(a) of the Exchange Act as well as the aiding and abetting thereof.

429.    Henry Schein is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

430.    Plaintiff is, and has been at all relevant times, a shareholder of Henry Schein. Plaintiff will adequately and fairly represent the interests of Henry Schein in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

431.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

432.    A pre-suit demand on the Board of Henry Schein is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following 15 individuals: Defendants Bergman, Paladino, Alperin, Benjamin, Breslawski, Brons, Goodman, Herring, Kuehn, Laskawy, Margulies, Mlotek, Raphael, Rekow, and Sheares (the "Directors"). Plaintiff needs only to allege demand futility as to eight of the 15 Directors who are on the Board at the time this action is commenced.

433.    Demand is excused as to all of the Directors because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they

110

engaged in knowingly or recklessly to cause the Company to participate in the Antitrust Conspiracy, to make and/or cause the Company to make the false and misleading statements and omissions of material fact while nine of them engaged in insider sales based on material non-public information, and, at the same time, to cause the Company to overpay by over $776 million for repurchases of its own stock, all of which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

434.    In complete abdication of their fiduciary duties, the Directors either knowingly or recklessly caused the Company to participate in the Antitrust Conspiracy and made and/or caused the Company to make the materially false and misleading statements alleged herein. While investors were duped into believing the fraud perpetrated by the Individual Defendants, 12 of the Individual Defendants, including nine of the Directors, sold Company stock at artificially inflated prices based on inside material information.

435.    As a result of the foregoing, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

436.    Additional reasons that demand on Defendant Bergman is futile follow. Defendant Bergman currently serves as the Company's CEO, and is thus, as the Company admits, a non-independent director. The Company provides Defendant Bergman with his principal occupation, and he receives handsome compensation, including $6,481,739 in 2018 for his services. Defendant Bergman was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on. As the Company's highest officer and as a

trusted Company director, he conducted little, if any, oversight of the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $37.1 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Bergman is a defendant in the 2018 Securities Class Action. For these reasons, Defendant Bergman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

437.    Additional reasons that demand on Defendant Paladino is futile follow. Defendant Paladino currently serves as the Company's CFO, and is thus, as the Company admits, a non-independent director. The Company provides Defendant Paladino with his principal occupation, and he receives handsome compensation, including $2,651,998 in 2018 for his services. Defendant Paladino was ultimately responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on. He also signed, and thus personally made the false and misleading statements in the Registration Statement, and personally made the false and misleading statements at the March 3, 2019 and March 13, 2019 industry conferences during the Second Relevant Period. As one of the Company's highest officers and as a trusted Company director, he conducted little, if any, oversight of the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $12.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Moreover, Defendant Paladino is a

defendant in the 2018 Securities Class Action. For these reasons, Defendant Paladino breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

438. Additional reasons that demand on Defendant Alperin is futile follow. Defendant Alperin has served as a Company director since 1996. Defendant Alperin has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $5.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Alperin signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Alperin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

439. Additional reasons that demand on Defendant Benjamin is futile follow. Defendant Benjamin has served as a Company director since 1988, and as Executive Vice President and Chief Administrative Officer of the Company since 2000. Thus, as the Company admits, he is a non-independent director. Defendant Benjamin has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties

to protect corporate assets. His insider sales, which yielded at least $13.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Benjamin signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Benjamin breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

440. Additional reasons that demand on Defendant Breslawski is futile follow. Defendant Breslawski has served as a Company director since 1992, as President of the Company since 2005, and as Vice Chairman of the Company since March 2018. Thus, as the Company admits, he is a non-independent director. Defendant Breslawski has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $22.9 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Breslawski signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Breslawski breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

441. Additional reasons that demand on Defendant Brons is futile follow. Defendant Brons has served as a Company director since 2005. Defendant Brons has received and continues

to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $6.2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Brons signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Brons breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

442.     Additional reasons that demand on Defendant Goodman is futile follow. Defendant Goodman has served as a Company director since May 2018. Defendant Goodman has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Goodman breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

443.     Additional reasons that demand on Defendant Herring is futile follow. Defendant Herring has served as a Company director since 2016. Defendant Herring has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the

Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Herring signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Herring breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

444.    Additional reasons that demand on Defendant Kuehn is futile follow. Defendant Kuehn has served as a Company director since 2016. Defendant Kuehn has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Kuehn signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, Defendant Kuehn breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

445.    Additional reasons that demand on Defendant Laskawy is futile follow. Defendant Laskawy has served as a Company director since 2002, and as the Company's lead director since 2012. Defendant Laskawy has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

His insider sales, which yielded at least $6.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Laskawy signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Laskawy breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

446.    Additional reasons that demand on Defendant Margulies is futile follow. Defendant Margulies has served as a Company director since May 2018. Defendant Margulies has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the scheme to make false and misleading statements during the Second Relevant Period, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Margulies breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

447.    Additional reasons that demand on Defendant Mlotek is futile follow. Defendant Mlotek has served as a Company director since 1995, and as Executive Vice President and Chief Strategic Officer of the Company since 2012. Thus, as the Company admits, he is a non-independent director. Defendant Mlotek has received and continues to receive compensation for his roles with the Company as described above. As a trusted Company officer and director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties

to protect corporate assets. His insider sales, which yielded at least $9.4 million in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Mlotek signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period, as well as in the Registration Statement. For these reasons, Defendant Mlotek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

448. Additional reasons that demand on Defendant Raphael is futile follow. Defendant Raphael has served as a Company director since 2012. Defendant Raphael has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Raphael signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Raphael breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

449. Additional reasons that demand on Defendant Rekow is futile follow. Defendant Rekow has served as a Company director since 2014. Defendant Rekow has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded her

duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Rekow signed, and thus personally made the false and misleading statements in the 2014, 2015, and 2016 10-Ks. For these reasons, Defendant Rekow breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

450. Additional reasons that demand on Defendant Sheares is futile follow. Defendant Sheares has served as a Company director since 2010. Defendant Sheares has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the Company's participation in the Antitrust Conspiracy and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. His insider sales, which yielded at least $127,368 in proceeds, demonstrate his motive in facilitating and participating in the fraud. Furthermore, Defendant Sheares signed, and thus personally made the false and misleading statements in each of the Company's 10-Ks filed during the First Relevant Period. For these reasons, Defendant Sheares breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

451. Additional reasons that demand on the Board is futile follow.

452. As described above, nine of the Directors directly engaged in insider trading, in violation of federal law and the Company's Code of Ethics. Defendants Bergman, Paladino, Alparin, Benjamin, Breslawski, Brons, Laskawy, Mlotek, and Sheares collectively received proceeds of over $113.7 million as a result of insider transactions executed during the First Relevant Period, when the Company's stock price was artificially inflated due to the Antitrust

Conspiracy and the false and misleading statements alleged herein. Therefore, demand in this case is futile as to them, and excused.

453.    Additionally, Defendants Bergman, Paladino, Alparin, Benjamin, Breslawski, Brons, Herring, Kuehn, Laskawy, Mlotek, Raphael, Rekow, and Sheares, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by over $776 million for its own common stock during the First Relevant Period. The Directors, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

454.    Defendants Alperin, Kuehn, and Laskawy (the "Audit Committee Defendants") served as members of the Audit Committee during the First Relevant Period and the Second Relevant Period. Pursuant to the Audit Committee Charter, the Audit Committee Defendants bear responsibility for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management and legal and regulatory compliance that may affect the Company's financial reporting. The Audit Committee Defendants failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter, allowing the Company to engage in improper accounting methods, to participate in the Antitrust Conspiracy, and to issue false and misleading financial statements with the SEC. Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

455.    Defendants Bergman, Paladino, Benjamin, Breslawski, and Mlotek (the "Executive Management Committee Defendants") served as members of the Executive Management Committee during the First and Second Relevant Periods. According to the 2019 Proxy Statement, the Executive Management Committee Defendants bear responsibility for, *inter alia*, oversight and management of material risks facing the company and its business, as well as reporting such risks to the Audit Committee and the other members of the Board. The Executive Management Committee Defendants failed to properly monitor and report such risks, allowing the Individual Defendants to cause the Company to participate in the Antitrust Conspiracy and to issue the false and misleading statements described herein, which resulted in extensive damages to the Company. Thus, the Executive Management Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

456.    Defendants Herring, Kuehn, and Raphael served as members of the Regulatory, Compliance and Cybersecurity Committee during the First and Second Relevant Periods, with Defendant Margulies also serving as a member during the Second Relevant Period (collectively, the "Regulatory, Compliance and Cybersecurity Committee Defendants"). According to the Regulatory, Compliance and Cybersecurity Committee Charter, the Regulatory, Compliance and Cybersecurity Committee Defendants bear responsibility for, *inter alia*, oversight and management of material risks relating to regulatory, corporate compliance, and cybersecurity issues, as well as reporting such risks to the Audit Committee and the other members of the Board. The Regulatory, Compliance and Cybersecurity Committee Defendants failed to properly monitor and report such risks, allowing the Individual Defendants to cause the Company to participate in the Antitrust Conspiracy and to issue the false and misleading statements described herein, which resulted in extensive damages to the Company. Thus, the Regulatory, Compliance and

Cybersecurity Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

457. The Directors have longstanding business and personal relationships with each other that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Directors would be futile.

458. In violation of the Business Standards, as well as the Code of Ethics with respect to Defendants Bergman and Paladino, the Directors conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act. In further violation of the Business Standards, as well as the Code of Ethics with respect to Defendants Bergman and Paladino, the Directors failed to maintain the accuracy of Company records and reports, comply with laws and regulations, and compete in an honest and ethical manner. Thus, the Directors face a substantial likelihood of liability, and demand is futile as to them.

459. Henry Schein has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Henry Schein any part of the damages Henry Schein suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

460.    The Individual Defendants' conduct described herein and summarized above, including the decisions for the Company to engage in the repurchases of its own stock could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

461.    The acts complained of herein constitute violations of fiduciary duties owed by Henry Schein's officers and directors, and these acts are incapable of ratification.

462.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Henry Schein. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Henry Schein, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

463.     If there is no directors' and officers' liability insurance, then the Directors will not cause Henry Schein to sue the Individual Defendants named herein, because, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

464.     Thus, for all of the reasons set forth above, all 15 of the Directors, and if not all of them, at least eight of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Securities Exchange Act of 1934

465.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

466.     The claims made pursuant to Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), that are alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

467.     Section 14(a) of the Exchange Act provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

468.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

469.    Under the direction and watch of the Directors, the 2017 Proxy Statement failed to disclose, *inter alia*, that: (1) as a result of the Antitrust Conspiracy, the dental products market was not competitive, but was in fact pervaded by price-fixing and other anticompetitive misconduct; (2) as an additional result of the Antitrust Conspiracy, the Company overstated the impact of cost containment and pricing strategies on its business; (3) as a further result of the Antitrust Conspiracy, the Company overstated the value of its products and services; (4) the Company participated in the Antitrust Conspiracy; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, Henry Schein's public statements were materially false and misleading during the First Relevant Period.

470.    Moreover, the 2017 Proxy Statement was false and misleading in discussing the Company's adherence to specific governance policies and procedures, including the Business Standards and the Code of Ethics, due to the Individual Defendants' failures to abide by them and their engagement in the scheme to cause the Company to participate in the Antitrust Conspiracy and to issue false and misleading statements and omissions of material fact.

471.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained

in the 2017 Proxy Statement was materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2017 Proxy Statement, including election of directors, appointment of an independent auditor, an advisory vote on executive compensation, an advisory vote on the frequency of executive compensation, and approval of an amendment extending the terms of the Company's Cash Bonus Plan to 2021.

472.    The false and misleading elements of the 2017 Proxy Statement led to the approval of the amendment extending the terms of the Company's Cash Bonus Plan to 2021 and to the re-election of Defendants Bergman, Paladino, Alperin, Bacow, Benjamin, Breslawski, Brons, Herring, Kabat, Kuehn, Laskawy, Mlotek, Raphael, Rekow, and Sheares, which allowed them to continue breaching their fiduciary duties to Henry Schein.

473.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2017 Proxy Statement.

474.    Plaintiff on behalf of Henry Schein has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act

475.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

476.    The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Henry Schein. Not only is Henry Schein now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also a victim of the unlawful scheme perpetrated upon Henry Schein by the Individual Defendants. With the price of its common stock trading at artificially-inflated prices

during the First Relevant Period due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase $1.67 billion of its own shares at artificially-inflated prices, damaging Henry Schein.

477. During the First Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

478. The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Henry Schein not misleading.

479. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Henry Schein. The Individual Defendants acted with scienter during the First Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and

for the false and misleading statements and/or omissions disseminated to the public through press releases, conference calls, and filings with the SEC.

480.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, they made and/or signed the Company's Form 10-Ks filed with the SEC during the First Relevant Period.

481.     By virtue of the foregoing, the Individual Defendants have violated § 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

482.     Plaintiff, on behalf of Henry Schein, has no adequate remedy at law.

## THIRD CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

483.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

484.     The Individual Defendants, by virtue of their positions with Henry Schein and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Henry Schein and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of § 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Henry Schein and the other Individual Defendants to engage in the illegal conduct and practices complained of herein.

485.     Plaintiff, on behalf of Henry Schein, has no adequate remedy at law.

## FOURTH CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

486.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

487.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Henry Schein's business and affairs.

488.    Each of the Individual Defendants violated and breached his fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

489.    The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Henry Schein.

490.    In breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in, the Antitrust Misconduct.

491.    The Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

492.    In further breach of their fiduciary duties owed to Henry Schein, during the First Relevant Period, the Individual Defendants intentionally or recklessly wasted corporate assets on repurchases of the Company's own stock at artificially inflated prices, caused the Company to participate in the Antitrust Conspiracy, and made and/or caused the Company to make false and misleading statements of material fact. Specifically, the Individual Defendants made and/or caused the Company to make false and misleading statements of material fact that failed to disclose that: (1) as a result of the Antitrust Conspiracy, the dental products market was not competitive, but was in fact pervaded by price-fixing and other anticompetitive misconduct; (2) as an additional result of the Antitrust Conspiracy, the Company overstated the impact of cost containment and pricing

strategies on its business; (3) as a further result of the Antitrust Conspiracy, the Company overstated the value of its products and services; (4) the Company participated in the Antitrust Conspiracy; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, Henry Schein's public statements were materially false and misleading during the First Relevant Period.

493. During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding Covetrus's business, operations, and prospects. Specifically, the Individual Defendants caused the Company to make, and Defendants Paladino and Mlotek also personally made, false and misleading statements of material fact that: (1) Covetrus would require millions of dollars in infrastructure investments relating to Covetrus's supply chain and inventory management services; (2) Covetrus was not fully apprised as to the additional infrastructure investments that Covetrus would require; (3) the expenses related to Covetrus's TSAs with Henry Schein had been significantly understated; and (4) a competitive market, as well as the loss of a significant North American customer "weighed heavily" on Covetrus's growth prospects.

494. The Individual Defendants failed to correct and caused the Company to fail to correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

495. In breach of their fiduciary duties, 12 of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the inflated revenues caused by the Antitrust Conspiracy and due to the false and misleading statements of material fact that failed to disclose the Antitrust Conspiracy.

496.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Henry Schein's securities, disguising insider sales, and hiding the Antitrust Conspiracy.

497.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly.

498.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

499.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Henry Schein has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

500.    Plaintiff, on behalf of Henry Schein, has no adequate remedy at law.

## FIFTH CLAIM

**Against the Individual Defendants for Unjust Enrichment**

501. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

502. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Henry Schein.

503. The Individual Defendants either benefitted financially from the improper conduct or received profits, bonuses, stock options, or similar compensation from Henry Schein that was tied to the performance or artificially inflated valuation of Henry Schein, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

504. Plaintiff, as a shareholder and a representative of Henry Schein, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

505. Plaintiff on behalf of Henry Schein has no adequate remedy at law.

## SIXTH CLAIM

**Against Individual Defendants for Abuse of Control**

506. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

507. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Henry Schein, for which they are legally responsible.

508. As a direct and proximate result of the Individual Defendants' abuse of control, Henry Schein has sustained significant damages. As a direct and proximate result of the Individual

Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Henry Schein has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

509.    Plaintiff on behalf of Henry Schein has no adequate remedy at law.

## SEVENTH CLAIM

### Against Individual Defendants for Gross Mismanagement

510.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

511.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Henry Schein in a manner consistent with the operations of a publicly-held corporation.

512.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Henry Schein has sustained and will continue to sustain significant damages.

513.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

514.    Plaintiff on behalf of Henry Schein has no adequate remedy at law.

## EIGHTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

515.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

516.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused Henry Schein to waste valuable

corporate assets and to incur many millions of dollars of legal liability and costs to defend unlawful actions. In addition, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

517.    Furthermore, the Individual Defendants caused themselves to receive excessive compensation from the Company given their misconduct, thereby wasting the Company's assets.

518.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

519.    Plaintiff on behalf of Henry Schein has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Henry Schein, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Henry Schein;

(c)    Determining and awarding to Henry Schein the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Henry Schein and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Henry Schein and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.  a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

2.  a provision to permit the shareholders of Henry Schein to nominate at least eight candidates for election to the Board; and

3.  a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)      Awarding Henry Schein restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.


Dated: November 15, 2019                    Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
Saadia Hashmi
240 Townsend Square

Oyster Bay, New York 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## **VERIFICATION**

I, Frank Finazzo   am a plaintiff in the within action.   I have reviewed the allegations made in this consolidated shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this _th day of _____, 2019.
11/7/2019

_FF_

_____
Frank Finazzo